FARMERS UNION LIVESTOCK COMMISSION ET AL., APPELLANTS, v. UNION PACIFIC RAILROAD COMPANY ET AL., APPELLEES.

283 N. W. 498

FILED JANUARY 20, 1939. No. 30266.

*Dana B. Van Dusen,* for appellants.

*T. W. Bockes, T. F. Hamer, George C. Holdrege, J. W. Weingarten, Wymer Dressler, Robert D. Neely, Guy C. Chambers, W. P. Loomis* and *D. M. Murphy, contra.*

*Edwin Vail, amicus curiæ.*

Heard before SIMMONS, C. J., ROSE, EBERLY, PAINE, CARTER and MESSMORE, JJ.

CARTER, J.

This is an action at law brought by certain live stock commission firms in Omaha, or their attorneys in fact,

against all of the intrastate railroad carriers of live stock serving the stockyards at that point, to enforce the payment of reparations ordered by the Nebraska state railway commission based on the failure of the line haul or trunk railroads to absorb switching charges of the Union Stock Yards Company, or its successor, the South Omaha Terminal Railway Company, for switching car-loads of live stock from the terminals of the trunk lines to and from the loading and unloading chutes of the stockyards itself. The trial court found for the defendant railroad companies, and the plaintiffs appeal.

The record shows that, prior to 1896, the line haul carriers serving South Omaha owned their own trackage into the stockyards and no switching charges were assessed on shipments to and from those yards. Subsequently, the railroad carriers of live stock entered into an agreement with the Union Stock Yards Company whereby that company took over the tracks owned by the line haul carriers in so far as those tracks were within the stockyards district. Since that time the Union Stock Yards Company has operated as a common carrier, primarily for the purpose of serving the stockyards, and has established switching charges for the handling of traffic between the interchange tracks of the line haul carriers and the chutes within the stockyards. As a result of this change a switching charge of 50 cents per car-load of livestock was assessed, which charge was wholly absorbed by the line haul or trunk railroads. On December 8, 1908, the railway commission authorized the Union Stock Yards Company to collect a switching charge of 75 cents per car-load of live stock and ordered further that the line haul carriers absorb the whole charge. On September 16, 1910, the railway commission authorized the Union Stock Yards Company to increase the switching charge to $1 per car-load of live stock and ordered the absorption of the full charge by the line haul carriers. On June 12, 1918, the railway commission authorized an increase of the switching charge to $1.50 per car-load of live stock and ordered the line haul carriers to

show cause why they should not absorb the whole charge. It appears, however, that the control of the railroads had been taken over by the federal government on December 28, 1917, and no attempt was made by the railway commission to compel a complete absorption of the switching charge by the line haul carriers. On August 27, 1920, the interstate commerce commission authorized a 35 *per centum* increase in all interstate rates. The Nebraska railway commission took similar action, but allowed a 25 *per centum* increase only on intrastate rates. On January 27, 1921, the interstate commerce commission ordered all steam railway carriers in Nebraska to comply with its order for a 35 *per centum* increase of freight rates for the reason that the Nebraska rates were discriminatory as against the interstate rates, making the switching charge of the Union Stock Yards Company $2 per car-load of live stock and the line haul carriers amount of absorption $1.50, leaving a balance of 50 cents per car-load of live stock to be paid by the shipper or receiver of the stock. On July 1, 1922, the switching rates along with all other freight rates were reduced approximately 10 *per centum*, making the new switching charge $1.82 per car-load of live stock, $1.35 of which was absorbed by the line haul carriers and 47 cents passed back to the shippers and receivers of live stock. By a decree of the United States district court, the Nebraska state railway commission was enjoined from enforcing sections of statutes and rules in conflict with the foregoing orders of the interstate commerce commission. Thereafter, and on May 5, 1922, the railway commission vacated its order increasing freight rates 25 *per centum*, and its orders supplemental thereto, expressly stating that the intrastate rates then in force should remain in effect until changed by a subsequent order of the commission. On May 3, 1924, the railway commission, after a complete investigation of the freight rate structure in Nebraska, entered its permissive order that all freight charges be based on distances from the points of origin to final destination. The opinion of the railway commission accompanying the order states:

"Distances to South Omaha stockyards shall govern the rates." On September 1, 1932, the railway commission, without entering an order, found the new rates to the Missouri river markets prescribed in the "Interstate Commerce Commission Docket 17000, Rate Structure Investigation, Part 9, Livestock—Western Division Rates," a copy of which is in the record, as reasonable maximum rates and that they should include delivery to the unloading chutes of the Union Stock Yards Company without the assessment of the additional switching charges. The effective date of this order was, upon application, postponed until November 1, 1932. It was therefore definitely ordered under the new rates effective November 1, 1932, whether interstate or intrastate, that line haul carriers were to absorb the full amount of the switching charge.

It is not contended by the parties that the switching charge of $1.82 per car-load of live stock is an unreasonable charge for the service and facilities furnished. The allegation of unreasonableness is based wholly upon the failure of the line haul carriers to absorb this entire charge out of line haul rates; in other words, upon the view that the line haul rates are unreasonable in amounts equal to the unabsorbed portion of the switching charge, in that they do not cover all transportation service to and from the loading and unloading chutes in the South Omaha stockyards. Plaintiffs further contend that the orders of the railway commission requiring the use of distances to the South Omaha stockyards necessarily contemplated the handling of stock to and from the loading and unloading chutes solely on the basis of the line haul rates. It is upon this basis that plaintiffs asked, and the railway commission granted, reparations to the extent of 47 cents per car-load of live stock shipped in and out of the South Omaha stockyards under the provisions of section 75-510, Comp. St. 1929. The period during which reparations must be paid, if liability therefor attaches, the number of car-loads of live stock shipped in and out of South Omaha stockyards, and the amounts owing if the defendants are liable,

are all stipulated in the record. The present action was brought only for the sum of $318.19 on a very few of the shipments involved in the order of the railway commission, these being selected in such a way as to lay the foundation for the determination of every issue involved in the commission's order. Plaintiffs estimate, and the defendants agree, that total reparations, with interest, if defendants are liable therefor, will amount to approximately $175,000. The question for determination in this suit is whether the trial court rightfully denied a judgment for reparations based on the order of the railway commission requiring their payment.

That the stockyards company is a common carrier has been heretofore determined. *State v. Union Stock Yards Co.,* 81 Neb. 67, 115 N. W. 627. Under the Nebraska regulatory act, section 75-403, Comp. St. 1929, it is not unlawful for the railway commission to allow charges in excess of the line haul rate for terminal service and facilities, the statute in part saying: "The schedules shall plainly state the places upon its road between which property and passengers will be carried, * * * stating separately any terminal charges, and any rules and regulations which in anywise change, affect or determine any of the aggregate of such rates, fares and charges." To like effect is the interstate commerce act as passed by the federal congress. 49 U. S. C. A., sec. 6, par. 1. It seems to us, therefore, that the fixing of a line haul rate does not of itself include the cost of terminal services and facilities and whether it does or not must be determined from the orders of the railway commission establishing such rates. See *Walker v. Keenan,* 73 Fed. 755; *Interstate Commerce Commission v. Chicago, B. & Q. R. Co.,* 186 U. S. 320.

The source of the difficulty resulting in this litigation was the act of the federal government in taking over the control of the railroads on December 28, 1917. Prior to that date all line haul rates fixed by the railway commission on intrastate shipments included the whole of the switching or terminal charge of $1 per car-load of live

stock. At the commencement of federal control the switching charge on interstate shipments was $1.50 per car-load of live stock, 75 cents of which was absorbed by the line haul carrier. On June 12, 1918, the railway commission authorized the Union Stock Yards Company to increase its switching charges to $1.50 per car-load of live stock on intrastate shipments and ordered the railroads to show cause by June 24, 1918, why they should not be required to absorb the whole of the increased switching charge. Due to the fact that the railroad properties were being operated by the director general of railroads, no further order was made with reference to the absorption of the switching charges by the line haul carriers. The increased switching charge of $1.50 per car-load was duly put into effect and remained in effect all during the period of federal control which ended on February 29, 1920. During this period the railroads absorbed $1 of the switching charge on intrastate shipments and 75 cents of the switching charge on interstate shipments. The balance of each charge was collected from the shipper or consignee of the live stock.

The period of federal control was terminated on February 29, 1920, by an act of congress which provided in part: "All rates, fares, and charges, and all classifications, regulations, and practices, in anywise changing, affecting, or determining, any part or the aggregate of rates, fares, or charges, or the value of the service rendered, which on February 29, 1920, are in effect on the lines of carriers subject to the interstate commerce act, shall continue in force and effect until thereafter changed by state or federal authority, respectively, or pursuant to authority of law; but prior to September 1, 1920, no such rate, fare, or charge shall be reduced, and no such classification, regulation, or practice shall be changed in such manner as to reduce any such rate, fare, or charge, unless such reduction or change is approved by the commission." 41 U. S. St. at Large, Part I, p. 464. Pursuant to the power reserved to it in this act, the interstate commerce commission, effective August 27, 1920, authorized a 35 *per centum* increase in

rates on interstate traffic and specifically authorized such increase to apply to switching charges. On August 23, 1920, the Nebraska railway commission denied a 35 *per centum* increase and ordered a 25 *per centum* increase only. The order, however, contained the following provisions: "It is further provided that (d) intrastate switching and special service (such as transit, weighing, diversion, reconsignment, storage, car rental and transfer) charges shall be increased twenty-five (25) per cent., provided that all existing absorption rules will be applied to the advances herein authorized." Thereupon the interstate commerce commission found that the increase of 25 *per centum* on intrastate traffic was discriminatory as to interstate commerce, and pursuant to the authority of section 13, par. 4, 49 U. S. C. A., ordered the 35 *per centum* increase of rates to be made. See, also, *Illinois Central R. Co. v. Public Utilities Commission*, 245 U. S. 493; *Railroad Commission of Wisconsin v. Chicago, B. & Q. R. Co.*, 257 U. S. 563. The order of the interstate commerce commission was sustained by the United States district court for the district of Nebraska and the rates therein established were made effective. Under this order the switching charge on intrastate carloads of live stock was $2 per car, $1.50 of which was absorbed by the line haul carrier. The switching charge on interstate car-loads of live stock was $2 per car, $1.25 of which was absorbed by the line haul carriers. These rates and charges were included in the tariffs published by the defendant railroad companies, copies of which were filed with the Nebraska railway commission and the interstate commerce commission.

On May 5, 1922, the Nebraska railway commission entered an order containing the following: "It is therefore ordered that the order made and entered in this cause on August 23, 1920, as modified by supplemental orders hereinbefore made, be, and the same is hereby vacated and set aside, thereby leaving the intrastate rates now in effect as lawful rates until hereinafter changed pursuant to order of this commission."

On May 24, 1922, the interstate commerce commission entered its order with reference to the order of the Nebraska railway commission under date of May 5, 1922, in part as follows: *"And it further appearing,* That by order entered April 7, 1922, as modified by order dated May 5, 1922, the Nebraska state railway commission has vacated and set aside its order of August 23, 1920, as modified, so as to authorize the Nebraska carriers to charge and collect on Nebraska intrastate traffic the full increases allowed by this commission in said docket Ex Parte 74, now in effect; and that the increased intrastate rates and charges prescribed by and established pursuant to the aforesaid orders heretofore entered by this commission will, if said orders of this commission be vacated in so far as they pertain to rates and charges for the transportation of freight, continue in effect as to the lawfully established and applicable intrastate rates and charges unless and until changes by further affirmative order of the competent authority of said state."

It seems to us therefore that the Nebraska railway commission, by its order of May 5, 1922, acquiesced in and adopted the rates promulgated by the interstate commerce commission and that the railroad companies were at this stage of the proceedings lawfully absorbing $1.50 of the $2 switching charge on each intrastate car of live stock and lawfully collecting 50 cents of the charge from the shipper or consignee. This is further borne out by the decree of the United States district court sustaining the intrastate rates established by the interstate commerce commission, wherein it states that the rates in question "are now lawfully in effect by virtue of the supplemental order of the Nebraska state railway commission in Application No. 4299, dated May 5, 1922."

On June 23, 1922, the railway commission authorized the railroads in Nebraska, effective July 1, 1922, to decrease their freight rates to correspond with decreases which had been authorized by the interstate commerce commission as shown by its order. The interstate commerce commis-

sion had ordered that the rates in effect be reduced so they would exceed the rates in effect on August 26, 1920, by 21.5 *per centum* instead of 35 *per centum.* In its order the railway commission said: "It is the intention of this order, and it shall be so construed, to permit Nebraska carriers, applicants in this case, to amend rates and charges on intrastate freight traffic in the same general manner and to the same extent as shall take place in complying with the findings of the interstate commerce commission." Clearly, this order authorized an increase in the switching charge of $1.50 per car in effect August 26, 1920, by 21.5 *per centum,* thereby fixing the switching charge at $1.82. On July 1, 1922, all railroads except the Union Pacific Railroad Company published tariffs by which they absorbed $1.35 of the switching charge, leaving the remaining 47 cents to be collected from the shipper or consignee. The Union Pacific Railroad Company provided in its published tariff of the same date for an absorption of $1.32 of the switching charge, leaving 50 cents per car-load to be collected from the shipper or consignee. On May 19, 1926, the Union Pacific Railroad Company applied for an order increasing the absorption on intrastate shipments from $1.32 to $1.35. On the same date, the railway commission entered its order authorizing the increase of the amount of the switching charge to be absorbed to $1.35 per carload of live stock. There can be no question that the railway commission was fully aware of the amount of the switching charge and the amount being absorbed by the line haul carriers. The order of May 19, 1926, shows that the railway commission considered the switching charge and the amount of absorption as a fixed rate by the commission by virtue of its order of May 5, 1922, when it accepted the rates then in effect as lawful rates, and its order of June 23, 1922, authorizing a reduction of intrastate rates to the same extent that they had been reduced by the interstate commerce commission. The rates thus established remained in effect until November 1, 1932, when an entirely new rate scale was established on both intrastate

and interstate shipments of live stock based on the distance from the point of origin to the point of destination. The rates prescribed, effective as of November 1, 1932; specifically provided that the entire switching charge should be absorbed by the line haul carrier.

We conclude, after an examination of all the orders of the railway commission on the subject, that the amount of the switching charge absorbed by the defendant companies here complained of was done upon the legal orders of the railway commission. Appellants contend that an order of the railway commission entered on May 3, 1924, and known as Resolution 74, required the absorption of the whole of the switching charge on intrastate shipments. It is true that this purported order stated that "Distances to South Omaha stockyards shall govern the rates." But it will be observed from a reading of Resolution 74 that it was merely permissive in character and not an order fixing a rate having the force and effect of a statute. The order states in part:

"It is expected that the carriers will publish specific rates from the respective points of origin to final destination and not merely a distance scale. The scales here set forth are not intended for such rigid application as would prevent meeting short line, or reasonable cross-country, competition.

"No order will be entered at this time for the reasons heretofore set forth. These findings are sufficient warrant for the carriers to publish out on statutory notice rates in accordance with the scales attached hereto in appendix. It is expected that the rates will be published to be effective on or before July 20, 1924. If such publication is not made the commission will reopen the case for such proceedings as are appropriate."

It will be noted the commission's opinion states that no order will be entered at this time and that if the recommended publication is not made the commission will reopen the case for such proceedings as are appropriate. The case was never reopened and no subsequent action was ever

taken thereon. It is contended that all rates and charges established pursuant thereto must be treated as carrier made, and if found to be unreasonable by the railway commission, the railroads could be subjected to the payment of reparations. We think this is true, but the fact remains that nothing was said in the order about the absorption of switching charges, and in view of the fact that the amount of the absorption was not changed by the carriers after the making of the permissive order, we are obliged to hold that it was governed entirely by the commission made order previously made. We necessarily conclude that Resolution 74 is not an order that was binding upon the railroads as a rate or charge fixed by the commission. As we have stated, it was permissive, but not an order entitled to the force and effect of a statute.

To specifically set forth every contention advanced by the appellants in their attempt to show that the switching charges in question were never fixed by the railway commission would require an indeterminable amount of space in this opinion. We must, by necessity, content ourselves with the statement that the record and briefs have been examined as to each point raised and a finding that the partial absorption of the switching charges was not authorized by the railway commission cannot be sustained. The further consideration of the case must therefore be bottomed on the premise that the partial absorption of the switching charges complained of was a rate or practice approved by, and, in effect, ordered by the Nebraska railway commission.

This court is committed to the rule that a rate put into effect by order of the railway commission has the force of a statute on the subject. Unless held to be unreasonable and arbitrary by the courts, it expresses the only reasonable rate governing the subject-matter contained in the order. *Central Bridge & Construction Co. v. Chicago & N. W. R. Co.*, 129 Neb. 726, 262 N. W. 852; *Arizona Grocery Co. v. Atchison, T. & S. F. Ry. Co.*, 284 U. S. 370. In other words, the absorption of $1.35 of the $1.82 switching charge and

the collection of the balance of 47 cents from the shipper or consignee was a legally and conclusively established legal rate or practice prior to November 1, 1932. It is not disputed that the railway commission's order of November 1, 1932, required the absorption of the whole switching charge by the line haul carriers. The question is whether, under such circumstances, the railway commission properly allowed reparations under section 75-510, Comp. St. 1929.

The reparations statute, section 75-510, Comp. St. 1929, is as follows: "That if, after hearing on a complaint under sections 6126, 6127, 6128, 6129 or sections 6137, 6138, 6139, 6140, Revised Statutes of Nebraska for 1913 (75-501 to 75-504, 75-506 to 75-509), the Nebraska state railway commission shall determine that any party complainant has on and after the taking effect of this act and within two years next preceding the filing of the said complaint paid unjust or unreasonable rates or charges to any defendant railroad or express company in this state on intrastate traffic or has on and after the taking effect of this act and within two years next preceding the filing of the said complaint suffered damages by reason of the maintaining, publishing, demanding, charging, receiving or retaining by such carrier of any rate or rates, charges, rules, regulations, services or practices on intrastate traffic which are found by the commission to be unjust, unreasonable, unjustly discriminatory, unduly preferential or otherwise unlawful, the commission shall make an order directing the railroad or express company to pay to the complainant the sum to which he is entitled on or before a day named."

It will be noted from the foregoing statute that reparations can be allowed only where it was found that the shipper had paid unreasonable or unjust rates or when the complainant suffered damages by reason of the collection of unjust, unreasonable, unjustly discriminatory, unduly preferential or otherwise unlawful rates or charges by the carrier. But the rate, or charge, or practice, whichever it may be in the instant case, was not unreasonable, unjust or unlawful, because the railway commission had

by action previous to its collection determined the contrary. Its action in so doing was equivalent to a legislative enactment on the subject. This being true, the railway commission was without authority to grant reparations.

There is a further reason why the plaintiffs cannot recover in this case. If section 75-510, Comp. St. 1929, could be construed to authorize the railway commission to retroactively condemn as unlawful a rate or charge previously established as lawful by it, it would amount to a taking of the property of the railroads without due process of law, a procedure inhibited by section 3, art. I, Constitution of Nebraska, and the Fourteenth Amendment to the Constitution of the United States.

In *Arizona Grocery Co. v. Atchison, T. & S. F. Ry. Co.,* 284 U. S. 370, the court said: "Where the commission has, upon complaint and after hearing, declared what is the maximum reasonable rate to be charged by a carrier, it may not at a later time, and upon the same or additional evidence as to the fact situation existing when its previous order was promulgated, by declaring its own finding as to reasonableness erroneous, subject a carrier which conformed thereto to the payment of reparation measured by what the commission now holds it should have decided in the earlier proceedings to be a reasonable rate." In the hearing of the same case in the circuit court of appeals, 49 Fed. (2d) 563, the court very aptly said: "The only constitutional restriction upon the legislative power to retroactively reduce rates suggested by the appellant is the constitutional prohibition against the taking of property without due process of law. That is, it is argued, the commission, having established a legal and lawful rate, the freight charges thus fixed, allowed and collected become the property of the carrier and cannot by a new retroactive law be arbitrarily taken away by legislative fiat. This position seems to be well taken. * * * That is to say, whether we regard the power of the commission in establishing a just and reasonable rate as a basis of reparations as a judicial power or as a 'legislative power, in either event

rates established by the legislative power and collected by the carrier cannot be taken from it because it is subsequently determined to be excessive, whether the belated determination is by court or legislature, or, to use the phrases more commonly applied to the acts of the commission, whether such subsequent determination is quasi legislative, administrative or quasi judicial—in either event a rate established by law—lawful when charged, remains lawful when attacked later by the shipper. The view we have expressed is supported by all the decisions of state courts construing laws establishing rate-regulating bodies having power to grant reparations for excessive rates charged by the carrier."

In *T. R. Miller Mill Co. v. Louisville & N. R. Co.*, 207 Ala. 253, 92 So. 797, the court said: "Such a practice would be odious to the generally established notions of justice, and would, moreover, be utterly subversive of the policy and utility of any system of rate regulation; for no rate could be relied upon as stable, and neither carrier nor shipper could ever be certain of the basis upon which business was being conducted. For it must be observed that, under such a practice, the commission would just as well find that a rate approved and imposed by it years before was in fact unreasonably low, and give retroactive operation to the higher rate later found to have been reasonable. Of course no such practice was contemplated, and no such power was vested in the commission."

Also, in *St. Louis-S. F. Ry. Co. v. State*, 155 Okla. 236, 8 Pac. (2d) 744, the court said: "The question before us, then, is whether or not, after the commission has made a rate, and it has been complied with by the carrier, and the goods hauled, and the collections made, it can later decide that the original rate allowed was excessive and require the carrier to refund. Natural justice would seem to require a negative answer."

In holding portions of a Kansas reparations statute invalid, the supreme court of that state said: "And to the extent that section 4 is designed in text and terms to

create a basis for a cause of action in behalf of a shipper for the exaction of a rate which the carrier was bound to charge under compulsion of statute, breaches of which were punishable by criminal prosecution, it violates the vested rights of the carrier under the provisions of the fourteenth amendment; it likewise offends against those orderly rules and principles for the administration of justice which constitute due process of law; and it is therefore unconstitutional and void." *State v. Public Service Commission,* 135 Kan. 491, 11 Pac. (2d) 999.

It seems quite apparent to us that the railway commission is without authority to set aside a rate or charge previously fixed by it on the ground that it is unreasonable as now viewed and proceed to grant reparations. Such a rate or charge is the reasonable, just and legal rate or charge until abrogated by the railway commission, or other competent authority, and an award of reparations based on the unreasonableness of such rate or charge is not authorized by section 75-510, Comp. St. 1929.

Appellants contend that the failure of the railroads to appeal from the reparations order made by the railway commission in which it was determined that failure to absorb the whole switching charge was an illegal practice has made that part of the commission's order conclusive. It is not necessary for us to decide the effect of the failure of the railroads to appeal. The fact remains that the railway commission did not have authority to grant reparations under the facts in this case. This being true, the commission's order purporting to so do is void. When the district court was called upon to enforce the railway commission's order for reparations, it had jurisdiction to inquire into the power of the railway commission to enter such an order. The trial court determined that the reparations order was invalid and in this it was correct. In view of the conclusion reached, it is not necessary for us to discuss or pass upon the other points raised in the briefs by the parties to the suit.

The judgment of the district court is

AFFIRMED.