Opinion by
 

 Hikt, J.,
 

 In their complaints before the Pennsylvania Public Utility Commission the . present appellants attacked established freight rates on artificially bonded molding sand when shipped by rail in open-top cars from River Yalley and from Cheswick to Breckenridge, West Home: stead, Neville Island, Sharpsville and Penn, all in western Pennsylvania within 100 miles of Pittsburgh. Two. of the appellants are producers and shippers of artificially bonded sand; the others are their customers and users of the processed sand. Six railroads serving the area have intervened in the proceedings as appellees. The artificially bonded sand, here involved, is known as Pittsburgh Loam Sand, and is a natural mixture of sand and gravel of various sizes, to which 15 to 25% loam or crude clay has been added. The raw materials, sand and loam, dug by power shovels from deposits at Cheswick or River Yalley, are hauled to processing plants where they are shoveled manually, in proper proportions in to a crushing pan to reduce the size of the gravel content. From there the mixture is screened and conveyed into cars for shipment. The addition of the clayey loam gives the mixture plasticity and a cohesive quality necessary for use in making molds for heavy iron castings. There is another suitable molding sand which in nature contains a similar bond content, known commercially as Naturally Bonded Molding Sand.
 

 The Interstate Commerce Commission in
 
 Industrial Sand Cases,
 
 1930, 204 I. C. C. 159, by order of October 8, 1934 as subsequently amended, had prescribed a “basic rate” scale applicable to rail shipments of naturally bonded sand in all types of cars. The basic rate was made to apply also to ground or pulverized sand when shipped in closed cars. Lower rates under a so-
 
 *176
 
 called “West Penn Scale” were prescribed by the order for all other types of sand when shipped in open-top cars. For our purposes we may assume that to be the extent of the order; its other provisions have no application here. Thereafter the question of the appropriate rates on molding sands did not immediately come before our Public Utility Commission, and in the meantime artificially bonded molding sand was shipped for distances up to 200 miles by the appellant-producers at common sand rates measured by the West Penn Scale.
 

 Inasmuch as artificially bonded molding sand competed directly with sand naturally bonded, in the uses to which it was put, it became apparent that on the shorter hauls, here involved, the lower rates for the artificially processed sand unduly prejudiced shippers of naturally bonded sand who under the basic scale were obliged to pay a higher rate. To remove this inequality the Interstate Commerce Commission in 1940, at the suggestion of carrier representatives, entered a further supplemental order in the above
 
 Industrial Sand Oases,
 
 in effect bringing artificially bonded molding sand under the same basic rates applicable to naturally bonded molding sand. Consistent with the above order as amended the carriers then filed new tariffs with the Interstate Commerce Commission and also with the Pennsylvania Public Utility Commission, which became effective on May 1, 1942. The new schedules applied the same rates to both types of bonded molding sand without discrimination in both interstate and intrastate commerce. For reasons which are of no relevancy here, the rates in question were not attacked by anyone until 1946 when the present appellants, in one complaint to the Public Utility Commission requested that the prior rates of the West Penn Scale on artificially bonded sand be restored and reparations paid, and in a
 
 *177
 
 second complaint sought to have the prescribed rates reduced below those in effect prior to May 1,1942. After full hearing before the Commission both complaints were dismissed on February 10, 1948. We are unable to find any merit in the present appeal. The order will be affirmed.
 

 The rates when attacked by the appellants had been in effect for four years following the order of May 1, 1942. The burden was on them to prove that the rates were unreasonable. In assuming this burden before the Commission they stressed certain transportation and classification factors. We will refer to those which they urged as controlling.
 

 Appellants introduced evidence to the effect that the average carload weight of all shipments of artificially bonded sand from Cheswick and River Valley, over the preceding period of two years, was 79.9 tons per car, and that the average shipments of the same material to Sharpsville were as high as 92.12 tons per car as against much lower average carload Aveights of other commodities and sand generally. As to this testimony the Commission noted that these shipments were largely northbound in oversized cars Avhich the Bessemer Railroad alone had acquired, for its ore trade, and that maximum loads of common sand in the same equipment Avould have Aveighed as much. In this respect all sands have identical transportation characteristics, but this does not mean that they necessarily belong in the same classification for rate making purposes. The price at Avhich a transported commodity is sold has long been án element to be considered in determining a reasonable freight rate, especially where discrimination is an issue. Cf.
 
 Borda v. Railroad Co.,
 
 141 Pa. 484, 496, 21 A. 665. Appellant-producers sold their processed sand for $1.50 and $1.60 per ton f.o.b. cars, prior to July 1,1946. These
 
 *178
 
 prices were then increased by 30 cents per ton. Common sand was priced at $1.30 per ton. Appellants contrasted these values with those of other industrial sands priced from $1.75 to $3.50 per ton. As to these other industrial sands the common sand scale applied both interstate and intrastate, but for the logical reason, noted in the present order, that they are silica sands which compete with common sand for distances up to 200 miles and on shorter hauls within the Pittsburgh area. Price comparisons, under the circumstances, do not indicate that artificially bonded sand is entitled to the same rate as common sand since the two are adapted to entirely different uses and do not compete with each other. The complainants compared the rates from Cheswiek and River Valley, applicable to the restricted area with which we are concerned, with the rates on all kinds of sands produced in Ohio, Wisconsin, Kentucky and elsewhere. Comparison was also made with rates on ashes, cinders, slag, fluxing stone, pig iron and related commodities. Prom these comparisons it was asserted that the established rate on artificially bonded sand was too high. The Public Utility Commission was impressed by respondents’ contention, however, that the complainants in the above respects were not comparing like things. In this connection the Commission in its order said: “The short-haul iron and steel rates cited are special rates in effect only in the Pittsburgh steel producing area. The rates apply between plants on one railroad and were made at the request of the shippers in the Pittsburgh district to obtain equality in production and distribution costs with other steel centers, namely, Chicago, Cleveland and St. Louis. . . . Rates for pig iron are also on a low level as the movements are generally be: tween plants of one concern. The rates on ashes and cinders are shown as wasting rates, the refuse, being
 
 *179
 
 handled to a dump, ofttimes of the railroad’s choice. The limestone rates cited are on a low level, the result of the keenest competition. Comparisons with scale rates in other states and territories are of little assistance since there is no showing of transportation conditions or other pertinent factors.” The Commission also referred to testimony for complainants to the effect that the Bessemer Railroad over a period of two years had hauled all freight an average of 108 miles for an average rate of return of 79 cents per ton, which is much less than the rate received by that carrier on bonded molding sand for the same distance. As to this the Commission noted that these averages included returns from through traffic, involving no terminal charges and observed that such comparisons have long been recognized as not representing a reasonable measure of a rate on a particular commodity.
 

 After considering all of the testimony, the Commission summarized its findings and conclusions thus: “Complainants’ position appears to be that because in some sections of the country a common level of rates applies on all types of sand, the same should be true within Pennsylvania. The record in this proceeding shows clearly, as hereinbefore related, the separation of common sand from industrial sands [except as above noted] for rating purposes. More than 25 years ago that practice became clearly established in this Commonwealth. Since then industrial sands have been rated higher. Naturally bonded molding sand is considered [to be] an industrial sand, and as this record shows the consistency of artificially bonded molding sand to1 be the same and its uses to be the same as those of naturally bonded molding sand, it follows that artificially bonded molding sand is an industrial sand of the same type. It appears clearly established, therefore, that the producers
 
 *180
 
 of artificially bonded molding sand cannot reasonably expect the common sand ratings to be applied to their industrial sand. . . . Upon all of the facts of record, we conclude and find that the rates on artificially bonded molding sand, in carloads, from Cheswick and River Valley to the destinations here in issue have not been shown to have been or to be unreasonable.”
 

 The two commodities, naturally bonded and artificially bonded molding sands, are identical in characteristics which determine the reasonableness of one classification, and the same freight rates applicable to both. The Commission gave due weight to the interstate rates, on the same commodities as fixed by federal authority, in considering the claimants’ demand for a change in intrastate rates which would upset the whole rate structure of these commodities. Cf.
 
 Penna. R. R. Co. v. Penna. P. U. C.,
 
 135 Pa. Superior Ct. 5, 4 A. 2d 622. The questions before the Commission were purely administrative. In this appeal the real complaint is that the Commission did not accept as controlling the factors on which the complainants relied. And here they are asking us to substitute our judgment for that of the Commission on the reasonableness of its classification and the rate prescribed. This we may not do. There is competent and substantial evidence supporting the Commission’s findings and its determination in this case; we therefore may not disturb the order. Section 1107 of the Public Utility Law of May 28, 1937, P. L. 1053, as amended, 66 PS §1437.
 
 Duquesne Light Co. v. Pa. P. U. C.,
 
 164 Pa. Superior Ct. 166, 63 A. 2d 466;
 
 Byham v. Pa. P. U. C.,
 
 165 Pa. Superior Ct. 253, 67 A. 2d 626.
 

 Order affirmed.