IN RE APPLICATION OF UNITED MINERAL PRODUCTS COMPANY.
UNITED MINERAL PRODUCTS COMPANY, APPELLEE, V. NEBRASKA RAILROADS OF WESTERN TRUNK LINES COMMITTEE, APPELLANT.
121 N. W. 2d 492

Filed May 3, 1963.   No. 35374.

Mason, Knudsen, Dickeson & Berkheimer, for appellant.

Nelson, Harding & Acklie and Richard A. Peterson, for appellee.

Heard before WHITE, C. J., CARTER, MESSMORE, YEAGER, SPENCER, BOSLAUGH, and BROWER, JJ.

WHITE, C. J.

This is an appeal from a Nebraska State Railway Commission order fixing reduced rates on the carriage of limestone dust. The general questions involved concern the power of the commission to correct discriminatory rates and whether the newly established rates are reasonable.

This action was commenced by the appellee shipper before the commission to establish a reduced joint line, single car commodity rail rate on limestone dust in covered hopper cars from Weeping Water to Ord, Allen, and Hastings, Nebraska, respectively. The limestone dust shipped from Weeping Water to these destinations is required to be shipped by the Missouri Pacific Railroad Company and the Chicago, Burlington & Quincy Railroad Company. The rate for this carriage will hereinafter be referred to as joint line rate. The Burlington alone ships limestone dust from Ashland, and the rate for this carriage will hereinafter be referred to as the single line rate. The appellee and shippers from Ashland are in competition for furnishing limestone dust on state highway contracts at the respective destinations of Ord, Allen, and Hastings. The rate structure per ton, at the time the application was filed, referred to hereinafter as the former rate structure, was as follows:

| From | TO ORD Mileage | Rate | TO ALLEN Mileage | Rate | TO HASTINGS Mileage | Rate |
|------|--------|------|--------|------|--------|------|
| Weeping Water | 195.8 | 4.30 | 151.6 | 3.93 | 131.1 | 3.75 |
| Ashland | 185.5 | 2.94 | 128.6 | 2.39 | 120.8 | 2.39 |

The rates to Ord, Allen, and Hastings were respectively $1.36, $1.54, and $1.36 per ton higher than the rates from the adjacent shipping point of Ashland with differences in mileage of approximately 10 miles on the movements to Ord and Hastings, and 23 miles to Allen. The appellee alleged that it was unable to compete on an equitable basis for the business of supplying construction projects at the destinations involved because of the magnitude of the rate preference, and that this preference constituted an unjust discrimination as to rates between shippers resulting in an obstruction of competition to the detriment of the appellee and the public. The appellant, Nebraska Railroads of Western Trunk Lines Committee, is a group of railroads organized to represent the railroads in rate matters and thus avoid duplication of effort, and the Burlington

represents this committee in this proceeding on behalf of itself and the Missouri Pacific, the two railroads directly involved.

After a hearing, the commission found that it had previously approved a differential of 54 cents per ton on the commodity for joint line rates over the single line rates, this being a switching charge for transfer from the Missouri Pacific to the Burlington at Lincoln for the Ord and Hastings shipments, and at Louisville for the Allen shipments. Integrating this joint line differential with the previous rate structure from Ashland, it established new rates from Weeping Water to Ord, Allen, and Hastings of $3.48, $2.83, and $2.93 per ton, respectively, to the different destinations.

The appellant railroads, in substance, contend that the new rates are not reasonable or compensatory and that the commission may not adjust the rates to equalize differences between competing shippers.

The problem in this case breaks down into two precise questions:

1. Could the commission reasonably find that the existing rates from Weeping Water to the destinations involved were unjustly discriminatory as between shippers of limestone dust at Ashland and Weeping Water?

2. If the old rates were discriminatory, did the commission act arbitrarily and unreasonably in establishing the new schedule of rates?

The testimony in this case consists, in a large part, of cost estimates based on system averages computed by the railroads over all of their lines in a district comprising several states. Based on these estimates, the rate experts for the railroads have converted these basic costs into application to the specific movements in controversy in this case, demonstrating by charts and mathematical computations that the ordered new rates are noncompensatory in nature as between Weeping Water and the three destinations involved. We summarize the portion of this mass of testimony that is

pertinent to the questions involved here as follows:

1. The appellee is a limestone material shipper, competitive with shippers of the Burlington at Ashland, Nebraska, and others.

2. Directly involved in this controversy were bidding and shipments of 1,190, 830, and 1,090 tons of limestone dust to be shipped to Ord, Allen, and Hastings, respectively.

3. Limestone dust is a heavy, low cost product moving in carload lots of 58 to 68 tons, with a value F.O.B. of $5 per ton. The carriage rates of $2.39 to $4.30 per ton bear a high proportion to the value of the product itself.

4. From Ashland to destinations involved here, the Burlington alone ships. This is known as a single line carriage and rate. The Missouri Pacific from Weeping Water hauls only to Lincoln and Louisville, a small percentage of the total distance, and then switches to the Burlington which completes the carriage. This is known as the joint line rate, and the switching charge at the points involved is known as the joint line differential.

5. The switching charge, or joint line differential, is agreed to by the parties and reflected in the order as being 54 cents per ton.

6. The rails, *in order to meet truck competition at Ashland on this commodity,* applied for and secured a special lower or depressed rate under a previously existing standard rate scale called the normal single line scale. This rate we will call the truck-compelled single line rate. This rate is obligatory and is roughly 40 to 50 cents per ton lower than the normal single line scale. There is no truck-compelled joint line rate from Weeping Water, and this is, in essence, why the complaining shipper filed this application.

7. The chief contention of the protesting railroads is the noncompensatory nature of the new rates. No actual cost figures were introduced by the rails to sustain this position. The opinion testimony of the rail-

road experts as to the actual costs involved were based, as mentioned before, on 1960 system-wide averages in several states. The effect of this testimony is to show that the old joint line rate from Weeping Water was compensatory, and that the Burlington truck-compelled competitive rates, as well as the normal single line rates, were substantially beneath the system average costs, with the competitive costs about 40 to 50 cents a ton underneath the normal rate. There is a variance in ton loadings, experts for the railroads using 60 tons for rate comparison, but there is testimony to sustain a finding that the shippers load up to 68 tons per covered hopper car, a differential making an obvious difference in costs per ton on each car.

Was the former rate structure discriminatory? Section 75-502, R. R. S. 1943, prohibits the railroads from giving any undue preference or advantage to any particular person *or locality*, or subjecting any particular description of traffic to any undue or unreasonable prejudice or disadvantage in any respect whatsoever. The commission, by section 75-208, R. R. S. 1943, is directed to make and is given the power "to correct abuses and prevent unjust discrimination." These powers are legislative in character, and when properly exercised, have the force of a statute on the subject. Nebraska Limestone Producers Assn. v. All Nebraska Railroads, 168 Neb. 786, 97 N. W. 2d 331; Farmers Union Livestock Commission v. Union Pacific R. R. Co., 135 Neb. 689, 283 N. W. 498. We have held directly that the power to compel a common rate on gravel and crushed rock to prevent *economic preference* in favor of gravel shippers to the extent shown, raises an issue peculiarly within the province of the commission to decide. Nebraska Limestone Producers Assn. v. All Nebraska Railroads, *supra.*

It is established law that this court may not and will not interfere with a commission order fixing rates if it

acts within the scope of its authority and if its order is not unreasonable or arbitrarily made.

The evidence in this case shows that shippers from Weeping Water to the destinations involved are paying rates per ton from 45 to 70 percent higher than the comparable truck-compelled competitive rates established by the railroads from Ashland. The mileage and joint line or switching differential between these points is the only justification offered for this disproportion in rates. Rate differences were $1.36, $1.54, and $1.36 a ton on movements ranging from only 10.3 to 23 miles further. The commission held, in effect, that the circumstances of the transportation were substantially similar, that the maintenance by a group of carriers of rates on a higher level from one point than another to the same destinations, with consequent injury to the point having the higher level, was discriminatory and preferential. This was a proper and reasonable exercise of its declared duty and power. New Orleans Traffic & Transp. Bureau v. Aberdeen & R. R. Co., 296 I. C. C. 59; Ohio-Kentucky Associated Industries v. Ahnapee & W. Ry. Co., 243 I. C. C. 579; Washington Potato & Onion Shippers Assn., Inc. v. Union Pacific R. R. Co., 300 I. C. C. 537. In the above cases, under a virtually identical statute, 49 U. S. C. A., § 3, (1), (2), (3), p. 219, it is pointed out that the unjust discrimination results from compelling the shippers to absorb, in a highly competitive market, rate differences disproportionate to any established difference in service or the condition of the transportation. Rate differences of a few cents per ton on a commodity of this type may be sufficient to divert the contract from one shipper to another.

The difference in rates is obviously disproportionate to the small mileage differential. The small mileage difference does not serve to obscure the discriminating nature of this competitive rate structure. Furthermore, with relation to mileage differences in fixing rates, the

fixing of zone on common destination territories and points of origin within a locality as to rates has long been recognized as a proper and even necessary·practice and will not justify a charge that the rate-fixing body's action is unreasonable and arbitrary. Ohio-Kentucky Associated Industries v. Ahnapee & W. Ry. Co., *supra;* Washington Potato & Onion Shippers Assn., Inc. v. Union Pacific R. R. Co., *supra;* New Orleans Traffic & Transp. Bureau v. Aberdeen & R. R. Co., *supra.*

The commodity cost of limestone dust is $5 a ton compared with an existing rate structure from Weeping Water running from $3.75 to $4.30 per ton. The high proportion of transportation cost to product value makes acutely significant a rate difference from adjacent points for competitive shippers, especially where the railroads have accomplished a special·truck-compelled rate reduction from one point only for an acknowledged competitive purpose. The effect of a discriminatory·rate structure in this situation is magnified. Further, the Burlington, in performing from 90 to 100 percent of both hauls should not be permitted to compensate its low·truck-compelled rate by maintaining a higher or compensatory rate against a competitive shipper. Where discrimination is an issue, the commodity price comparison with rates of transportation is an important issue. Allegheny Ludlum Steel Corp. v. Pennsylvania P. U. Commission, 166 Pa. Super. 173, 70 A. 2d 475. Discrimination·is a fact issue peculiarly committed to the discretion of the administrative body, based upon an application of all the facts and circumstances, and its decisions are not to be disturbed unless unsupported by evidence or for some reason amount to an abuse of power. New York v. United States, 331 U. S. 284, 67 S. Ct. 1207, 91 L. Ed. 1492; Swayne & Hoyt, Ltd. v. United States, 300 U. S. 297, 57 S. Ct. 478, 81 L. Ed. 659; Board of Trade of Kansas City v. United States, 314 U. S. 534, 62 S. Ct. 366, 86 L. Ed. 432.

From what has been said as expository of the evidence

as to discrimination, it is abundantly clear that the commission findings in this respect are not arbitrary, discriminatory, or beyond its range of granted powers.

We turn now to an examination of the validity of the newly ordered rates. The new rates from Weeping Water are the truck-compelled competitive rate from Ashland on the Burlington with the switching charge or joint line differential of 54 cents added.

Rate fixing is legislative in character, and carries a presumption of being just, reasonable, and lawful. Nebraska Limestone Producers Assn. v. All Nebraska Railroads, *supra*. *The lowest rates published, or charged, for substantially the same kind of service are prima facie evidence of a reasonable rate for the services under investigation.* § 75-402, R. R. S. 1943. In establishing *through* joint rates, section 75-308, R. R. S. 1943, in substance, requires the commission to consider average rates charged by the railroads *for shipments within this state for like distances over their respective lines.*

The main attack on the new rates is that they are noncompensatory and thus arbitrary and unreasonable. This position is premised on a voluminous showing in the evidence as to costs based on system-wide averages over several states based on 60-ton loads. Significantly absent from the evidence is any showing as to actual costs or a contention or suggestion as to the noncompensatory nature of the truck-compelled competitive rates of the Burlington's carriage from Ashland. System-wide average costs, especially for comparatively short hauls, are of little value by themselves in determining the compensatory nature of proposed rates. Iron & Steel Articles from Chicago, Ill. to South Dakota, 313 I. C. C. 185; Glassware from Michigan to Marion, Ind., 68 M. C. C. 337; Drugs, Trucks, Hides to and from Rocky Mountains, 61 M. C. C. 118. A rate comparison, however, forms a reasonable basis for rate determination. §§ 75-308, 75-402, R. R. S. 1943; Salt from Michigan to Joliet, Ill., 305 I. C. C. 118. There is evidence in

the record that limestone dust is loaded as high as 68 tons per load, and the commission also found that heavy carload commodities, such as limestone dust, do not move at the fully distributed cost level, but at a considerably lower level. Even assuming the application of a system-wide average of costs, the application by the commission of comparative rates and other factors cannot be found to be unreasonable and arbitrary. The real question is whether the new rate structure is substantially as compensatory as the unchallenged truck-compelled competitive rates adopted by the Burlington and the railroads at Ashland. These unchallenged rates are presumptive of the reasonableness of the new Weeping Water rates.

Railroads may not reduce rates to meet competition at one point and refuse to meet it at another where the circumstances are substantially similar. New River Co. & White Oak Coal Co. v. Chesapeake & O. Ry. Co., 245 I. C. C. 115; R. Robinson, Inc. v. Baltimore & O. R. R. Co., 269 I. C. C. 566. There is evidence in this record supporting the conclusion that the cost-rate ratio and the cost-revenue comparison of the two hauls only varies within a very small percentile range.

The appellant argued error in the commission's use of the Ashland truck-compelled rate as a base for the rates and not allowing anything more in the new rates than the 54 cents switching charge as a joint line differential, there being a small proportionate distance in mileage to the destination points. There is an allowance of 54 cents for a joint line differential, however, and this argument is based on a hypothetical comparison of single line rates existing from both places, and there is no single line rate from Weeping Water to make such a comparison. Furthermore, as pointed out previously, reasonable rate fixing does not require differential rates for small proportionate differences in mileage from adjacent points in the same locality. In the Burlington's truck-compelled rate shown by exhibit 5, the same rates

are applied to mileage differences, from the same point of origin on a single line, ranging from 5 to 50 miles. For example, the same rate of $3.75 is applied between the rates for 200 miles and the rate for 240 miles. See Ohio-Kentucky Associated Industries v. Ahnapee & W. Ry. Co., *supra*, applying the same rates as between Cincinnati, Louisville, St. Louis, and destination territories in eastern Wisconsin.

The appellant finally argued that the commission has no power to adjust rates to equalize competition and cites and quotes many cases. This principle is true, but it must correct discriminatory rates which injure competitive shippers which is the case here.

The record shows that an inadvertent error crept into the record by mutual mistake in basing the new rates on the assumption that the old rate from Ashland to Allen was $2.29, when it actually was $2.39. This should be corrected but forms no basis for overturning the commission's order.

The contention that the commission's action was unreasonable and arbitrary cannot be sustained. There was a reasonable basis for ordering rates which would be nondiscriminatory to Weeping Water shippers, and at the same time provide an overall return commensurate with the truck-compelled competitive rates established by the railroads at Ashland. Nothing that is said herein should be construed to limit the commission's power to readjust the level of the rates from both places, in a proper case and on sufficient evidence, to a different cost level. The appellant suggests that this court enact such rates. We have no such authority or power. The order of the commission is affirmed.

AFFIRMED.