IN RE FORMAL COMPLAINT OF NEBCO, INC.
NEBCO, INC., A CORPORATION DOING BUSINESS AS READY
MIXED CONCRETE COMPANY, APPELLEE, V. BURLINGTON
NORTHERN, INC., APPELLANT.

326 N.W.2d 167

Filed November 12, 1982. No. 44400.

Knudsen, Berkheimer, Beam, Richardson & Endacott, for appellant.

James W. Hewitt, for appellee.

Heard before KRIVOSHA, C.J., BOSLAUGH, McCOWN, WHITE, HASTINGS, and CAPORALE, JJ.

PER CURIAM.

This is an appeal from an order of the Nebraska Public Service Commission (NPSC) sustaining a complaint of Nebco, Inc., a Nebraska corporation, doing business as Ready Mixed Concrete Company (Nebco), that Burlington Northern, Inc. (BN), violated the provisions of Neb. Rev. Stat. § 75-126 (Reissue 1981) in discriminating against Nebco by refusing to absorb the switching charges of the Omaha, Lincoln & Beatrice Railway Company (OLB) on carload lots of sand and gravel delivered to Nebco. The NPSC found BN had discriminated and ordered that Nebco not be required to pay BN $10,604.63 in switching charges for services rendered by OLB during 1978.

Section 75-126 provides in part: "(1) Except as otherwise provided in this section, no common carrier shall:

"(a) Charge, demand, collect, or receive from any person a greater or less compensation for any services rendered than it charges, demands, collects, or receives from any other person for doing a like or contemporaneous service;

"(b) Make or give any undue or unreasonable preference or advantage to any particular person;

"(c) Subject any type of traffic to any undue or unreasonable prejudice, delay, or disadvantage in any respect whatsoever; *Provided,* that all types of perishable freight and livestock shall have precedence in shipment;

"(d) Charge or receive any greater compensation in the aggregate for the transportation of a like kind of property or passengers for a shorter than for a longer distance over the same line or route, except as the commission may prescribe in special cases to

prevent manifest injuries; *Provided,* that no manifest injustice shall be imposed upon any person at intermediate points; *and provided further,* that nothing herein shall prevent the commission from making group or emergency rates;

"(e) Demand, charge, or collect, by any device whatsoever, a lesser or greater compensation for any service rendered than that filed with or prescribed by the commission; or

"(f) Change any rate, schedule, or classification in any manner whatsoever before application has been made to the commission and permission granted for that purpose."

BN's principal defenses are that BN's absorption rate of switching charges conforms to previous orders of the NPSC and that the NPSC's order amounted to an order of a rebate of an approved rate which NPSC had no authority to make.

A summary of the facts will assist in understanding the issues. OLB, a small railroad operating in Lincoln, offers switching services to other railroads by delivering railroad cars to customers who have places of business along its tracks. OLB is a wholly owned subsidiary of Nebco. Up until April 3, 1978, OLB's established and approved tariff for switching sand and gravel to points west of 27th Street was $9.79 per car when the same shipper tendered lots of 10 cars or more on the same day; east of 27th Street the tariff was $15.65 per car under the same conditions. Nebco's plant is located west of 27th Street. These switching charges had previously been approved by the NPSC and were included in BN's intrastate tariff, and it required BN to absorb these switching charges. Whether or not a line railroad absorbs switching charges of another line railroad is a voluntary matter between the railroads involved. BN and the Union Pacific absorb switching charges on a reciprocal basis. The record shows that BN absorbed switching charges when it interlined with the

Union Pacific and the latter performed switching services for BN in deliveries of sand and gravel to Capital Concrete Company, Nebco's competitor in Lincoln. The evidence indicated that this gave Capital a competitive advantage of 15 cents per cubic yard in the sale of mixed concrete.

On January 19, 1978, OLB applied to NPSC to increase its switching charges west of 27th Street to $15.65 per car. On March 20, 1978, after a hearing, the NPSC approved the requested increase which was to become effective April 3, 1978. Thereafter, BN absorbed switching charges on shipments to Nebco only to the extent it had previously done, at $9.79 per car, and billed Nebco for the difference. Nebco declined to pay and this action resulted.

In connection with the positions taken by the parties, it is necessary to note some matters regarding the proceeding before the NPSC involving the January 19, 1978, application. Five railroads filed objections to the increase, including BN. The NPSC's opinion and findings in that matter included the following: "After the hearing opened the applicant [OLB] amended the application be [sic] deleting that portion of the original application which could be interpreted to mean that the application included the request that the Nebraska Railroads should increase their absorption to the same as these charges. Shortly after this amendment the attorney for the protestants withdrew their protest and left the room. . . . It was not known why the five Nebraska Railroads would not agree to absorb switching charges to the same extent as they do among themselves, but since a request to raise the absorption figures accordingly was not included in the amended application, the Commission cannot deal with that problem at this point."

Thereafter, pursuant to another application and hearing, NPSC required BN to absorb OLB's switching charges in the amount set in the 1978 order.

The new order became effective February 13, 1979.

Nebco, as we have already indicated, contended that BN's refusal to absorb OLB's switching charges as it does for other railroads is discriminatory and that NPSC has authority to correct the discrimination. As legal authority for this position, it relies upon the language of the statute we have earlier quoted and cases decided thereunder, and, in particular, upon our opinion in *Myers v. Blair Tel. Co.,* 194 Neb. 55, 230 N.W.2d 190 (1975). It further argues that discrimination cannot be determined in advance but can only be done in light of a particular set of facts. It cites the provisions of Neb. Rev. Stat. § 75-118.01 (Reissue 1981) which, among other things, gives the NPSC authority to determine the validity of tariffs.

BN, on the other hand, argues that when the NPSC prescribes a rate scale, it exercises a legislative function and may not repeal or modify it retroactively. BN relies upon *Arizona Grocery v. Atchison Ry.,* 284 U.S. 370, 52 S. Ct. 183, 76 L. Ed. 348 (1932), and *Farmers Union Livestock Commission v. Union P. R. Co.,* 135 Neb. 689, 283 N.W. 498 (1939).

In *Myers,* this court upheld the action of the NPSC reducing retroactively previously approved rates. In so doing we relied upon § 75-126(1)(c), which provides: "(1) Except as otherwise provided in this section, no common carrier shall: . . . (c) Subject any type of traffic to any undue or unreasonable prejudice, delay, or disadvantage in any respect whatsoever . . . ." We also relied upon the authority granted the commission by the Constitution.

In that case the complaint before the NPSC was that the utility was not providing the service for which the previously approved rates had been established. The commission found that the services being furnished were inadequate. We said: "It seems to us to be axiomatic that the commission, as a part of its power and duty to establish rates which

will provide an adequate return and to regulate the services of utilities, must have the authority to compel the utility to render the service for which it induced the commission to fix an adequate rate. We hold that inherent in the power of the commission is its right to force a utility to give the service for which its rates have been fixed. As a corollary to that power must be the right, where the service is woefully inadequate, to require the utility to rebate some portion of the rates set for reasonably adequate service. To hold otherwise would permit a utility to profit by its own intentional or unintentional neglect. The record indicates that the service was so inadequate in this instance that the remedy chosen by the commission was the only one which would keep the company from confiscating the rates paid by the ratepayers for wholly inadequate service." *Myers* at 63, 230 N.W.2d at 196.

The case before us does not involve a question of failure to render adequate service, i.e., the service for which the rate was set. *Myers* is clearly distinguishable from the situation before us, and we believe the controlling principles are set forth in *Farmers Union Livestock Commission v. Union P. R. Co., supra,* and *United Mineral Products Co. v. Nebraska Railroads,* 177 Neb. 898, 131 N.W.2d 604 (1964). At the time we rendered our opinion in *Farmers Union,* a reparation statute existed. Comp. Stat. § 75-510 (1929). It purportedly authorized the railway commission (now NPSC) to make orders requiring any railroad or express company to refund any unjust, unreasonable, or discriminatory rates charged. We held that the statute did not authorize the commission to retroactively condemn as unlawful a rate or charge previously established as lawful by it and subject a carrier, which has conformed thereto, to the payment of reparations measured by what the railway commission "now holds" it should have decided in the earlier proceedings to be

a reasonable and lawful rate, and that such a statute, under the circumstances, violated the due process clauses of the state and federal Constitutions.

In *United Mineral Products Co.* we adhered to the principle enunciated in *Farmers Union,* saying: "The commission's action in finding the amount due under the supersedeas bond had the effect of changing the rates retroactively which it is not authorized to do. Farmers Union Livestock Commission v. Union P. R.R. Co., *supra."* *United Mineral Products Co.* at 905, 131 N.W.2d at 609.

The distinction between our holding in *Myers* and our holding in the latter two cases is that in *Myers* the utility was not performing the service for which the rate was set. The distinction is significant and basic. In the present case the rate had been lawfully set. The NPSC order did not require absorption of the switching charge by the railroad with which the shipment originated. There exists in this case no question of failure to furnish the service for which the rate was established. As we said in *United Mineral Products Co.,* " 'Rates and charges duly established by the railway commission, until altered or set aside, have the effect of a legislative enactment.' " *Id.* at 902, 131 N.W.2d at 607.

The NPSC exceeded its constitutional and statutory authority in this instance. The order of the NPSC is reversed and the case is remanded with directions to dismiss the complaint.

REVERSED AND REMANDED WITH DIRECTIONS.

CLINTON, J., participating on briefs.