WARD TRANSPORT, Inc., a Colorado corporation; T. Clarence Bridge and Harry W. Bridge, dba Bridge Brothers; Groendyke Transport, Inc., an Oklahoma corporation; Earl Houk, dba Western Nebraska Transport Service; Frank C. Klein & Co., Inc., a Colorado corporation; Melton Transport Company, a Wyoming corporation; R. B. (Dick) Wilson, a Colorado corporation, Plaintiffs,

Barlow's Service Inc., Intervenor,

v.

UNITED STATES of America; Interstate Commerce Commission; The Atchison, Topeka and Santa Fe Railway Company, a corporation; Chicago, Burlington & Quincy Railroad Company, a corporation; Chicago and North Western Railway Company, a corporation; Chicago, Rock Island and Pacific Railroad Company, a corporation; the Colorado and Southern Railroad Company, a corporation; the Colorado & Wyoming Railway Company, a corporation; the Denver and Rio Grande Western Railroad Company, a corporation; the Great Western Railway Company, a corporation; Missouri Pacific Railroad Company (Guy A. Thompson, Trustee) a corporation; Union Pacific Railroad Company, a corporation, Defendants.

Civ. A. No. 4595.

United States District Court
D. Colorado.

Nov. 1, 1954.

Albert L. Vogl, William F. Reynard, Denver, Colo., for plaintiffs. Robert N. Burchmore, John S. Burchmore, and Nuel D. Belnap, Chicago, Ill., of counsel.

Means, Means & Roberts and Stanley H. Johnson, Denver, Colo., for intervenor.

Stanley N. Barnes, Asst. Atty. Gen., Donald E. Kelley, U. S. Atty., Denver, Colo., James E. Kilday, Albert Parker, Maurice A. Fitzgerald, Sp. Assts. to the Atty. Gen., for the United States.

Edward M. Reidy, Chief Counsel, and Allen Crenshaw, Associate Chief Counsel, Washington, D. C., for Interstate Commerce Commission.

Douglas McHendrie, Denver, Colo., S. R. Brittingham, Jr., Chicago, Ill., F. O. Steadry, Chicago, Ill., W. V. Nodges, Jr., Denver, Colo., Harry E. Boe, Chicago, Ill., John C. Street, Robert F. Welborn, H. M. Boyle, M. B. Holt, Jr., Denver, Colo., J. W. Preston, Pueblo, Colo., Toll R. Ware, St. Louis, Mo., E. G. Knowles, Denver, Colo., Elmer B. Collins, Omaha, Neb., James A. Gillen, Chicago, Ill., for defendant railroads.

Before PHILLIPS, Chief Judge, PICKETT, Circuit Judge, and KNOUS, District Judge.

KNOUS, Chief Judge.

This is an action brought by Ward Transport, Incorporated, and six other motor carriers against the United States, the Interstate Commerce Commission and ten defendant railroad corporations to enjoin, set aside and annul the report and orders entered by the Commission in a proceeding entitled "Investigation and Suspension Docket No. 5853, Petroleum from Colorado and Wyoming to Western Truck Line Territory." Since the filing of the action Barlow's Service Inc., another tank-truck carrier operating in the above area has been permitted to intervene as a plaintiff pursuant to Rule 24(c) F.R.C.P., 28 U.S.C.A.

The railroads filed tariffs with the Commission in October, 1950, reducing the tank car rates on refined oil, principally gasoline and distillate fuel oil from refinery points and pipe lines in Colorado and Wyoming to destinations in Colorado, Wyoming, South Dakota, Nebraska and Kansas. The proposed rates were generally 1.5 cents per hundred pounds less than published motor carrier rates between the same points. There were instances in which that basis varied slightly but such exceptions are not material here. The truck carriers filed an objection with the Commission on September 21, 1950, requesting it to suspend the proposed rates and enter into an investigation concerning their lawfulness. The proposed tariffs were suspended by the Commission and the defendants voluntarily postponed the effective date of the tariffs beyond the seven-month period provided for in the Act. 49 U.S.C.A. § 15(7). After the hearing, the examiner filed his proposed findings and recommendations. Oral argument was had before the Commission on December 17, 1952. In the report which followed, the Commission, inter alia, found as follows:

"This proceeding is part of a general effort by the railroads to regain some of the refined petroleum traffic. It is impossible generally for the railroads to compete with the pipe lines, but there are reasonable grounds for the belief that they may continue to compete profitably with the tank-truck carriers within certain limitations. The record clearly shows that under an equal basis of rates in this territory the tank trucks have gradually taken over the movements, in Colorado, for example, up to 92.5 percent of the total traffic. In other territories where reduced rail rates have been filed to meet tank-truck competition, the Commission has found as a fact that the railroads cannot compete successfully with the tank-truck carriers at equal rates. The record is convincing that in the territory here considered the railroads cannot successfully compete with the motor carriers at equal rates, and that the proposed rates are not lower than necessary to meet the truck competition and are compensatory, except for the shorter hauls.

"The evidence before us, including the costs of the tank-truck carriers as shown by the protestants, is convincing that for hauls below about 75 miles the tank-truck costs are lower than those of the rail carriers, and that for the longer hauls the reverse is true. It thus appears that for the shorter hauls the motor carriers have an inherent advantage in

cost over the rail carriers, and that the reverse is true for the longer hauls. There is no evidence before us that the respondents could operate under the proposed rates for the shorter hauls without casting a burden upon other traffic. In these circumstances, approval of the proposed rates for the shorter hauls would run counter to the national transportation policy of the Congress to provide for fair and impartial regulation of all modes of transportation so as 'to recognize and preserve the inherent advantages of each.'

"We are of the opinion that the respondents' rates on this traffic for short-line distances under 75 miles should be no lower than the corresponding rates of the tank-truck carriers, and that for the longer hauls their rates should in no instance be lower than 1.5 cents under the prevailing tank-truck rates from and to the same points."

In pursuance, the order of the Commission cancelled the proposed schedules and the proceedings were discontinued without prejudice to the establishment of rates in conformity with the views expressed in the Commission's report. On January 5, 1954, the Commission denied plaintiff's petition of reconsideration and reargument and this action was instituted thereafter.

Thereby, among other things, questions are raised as to the sufficiency of the evidence to support the foregoing finding that the rail rates in concern are reasonable on the basis of being compensatory and that the competitive situation justified such rates under the National Transportation Policy.

It is settled law that the orders of the Interstate Commerce Commission are final unless they are beyond its statutory or constitutional power, or based upon a mistake of law. In determining the latter question, an order may be set aside if the rate is so low as to be confiscatory or if the Commission acts arbitrarily and fixes rates contrary to the evidence or without evidence to support them, or if it exercises its authority in an unreasonable manner. Board of Trade of Kansas City v. United States, 314 U.S. 534, 546, 62 S.Ct. 366, 86 L.Ed. 432; Interstate Commerce Commission v. Union Pacific Railroad Co., 222 U.S. 541, 547, 32 S.Ct. 108, 56 L.Ed. 308; Petroleum Products in Illinois Territory, 280 I.C.C. 681, 685; Petroleum Products from Los Angeles, Arizona and New Mexico, 280 I.C.C. 509, 516.

The courts have also recognized the technical and the complex nature of rates and have approved them when there is "a rational basis for the conclusions approved by the administrative body." Mississippi Valley Barge Co. v. United States, 292 U.S. 282, 287, 54 S.Ct. 692, 694, 78 L.Ed. 1260; Virginian Railway Co. v. United States, 272 U.S. 658, 663, 47 S.Ct. 222, 71 L.Ed. 463. See also New York v. United States, 331 U.S. 284, 346, 67 S.Ct. 1207, 91 L.Ed. 1492; Board of Trade of Kansas City v. United States, supra; United States v. Chicago Heights Trucking Co., 310 U.S. 344, 352, 60 S.Ct. 931, 84 L.Ed. 1243; Manufacturers Railway Co. v. United States, 246 U.S. 457, 481, 38 S.Ct. 383, 389, 62 L.Ed. 831.

In the latter case the Court said:

"Whether a preference or advantage or discrimination is undue or unreasonable or unjust is one of those questions of fact that have been confided by Congress to the judgment and discretion of the Commission (Interstate Commerce Commission v. Alabama Midland Ry. Co., 168 U.S. 144, 170, 18 S.Ct. 45, 42 L.Ed. 414), and upon which its decisions, made the basis of administrative orders operating in futuro, are not to be disturbed by the courts except upon a showing that they are unsupported by evidence, were made without a hearing, exceed constitutional limits, or for some other reason amount to an abuse of power."

Considered on this basis, it is our opinion that the record and evidence abundantly justify the finding of the

Commission that in the movements here involved the railroads can not compete with the tank-truck carriers on a parity of rates.

Such appears from the undisputed evidence that in Wyoming and Colorado crude oil pipe lines have been built from the producing fields, extending from the most northerly producing field, the Elk Basin, to the east, south and west. Such pipe lines serve refineries located at Lovell, Zube, Thermopolis, Casper, Glenrock, Sinclair, and Cheyenne, Wyoming and Denver, Colorado. Product pipe lines have been constructed from Casper to Cheyenne, and to Denver, and from Borger, Texas to La Junta and Denver, Colorado. As a result the hauls of gasoline and light oils have been greatly decreased. Between 1940 and 1949, the number of barrels of crude oil refined in the State of Colorado increased 91 per cent and in Wyoming 91 per cent. In 1935, the total consumption of gasoline in Colorado was 178,000,000 gallons. Of that total, 14 per cent was handled by trucks and 86 per cent was handled by rail carriers. In 1947, just before the pipe lines were completed into Colorado, the total consumption had increased to 373,000,000 gallons, of which trucks handled 66.9 per cent and rail carriers 33.1 per cent. By 1950, the consumption had increased to 450,000,000 gallons, of which 92.5 per cent was handled by trucks and 7.5 per cent by rail carriers. Stated another way, of the total con-sumption in 1935 of 178,000,000 gallons, the railroads handled 153,000,000 gallons. Of the total consumption in 1950 of 456,000,000 gallons, the railroads handled only 34,000,000 gallons.

The same relative changes in the amounts of gasoline and other fuel products transported from Wyoming and Colorado to Western Nebraska by tank truck and railroads has taken place between 1940 and 1950.[1]

Passing now to the matter of the rates involved.

The finding by the Commission that for hauls below 75 miles, the tank truck costs are lower than those of the rail carriers and that for the shorter hauls the motor carriers have an inherent advantage in costs over the rail carriers was established by the cost averages introduced by the truck carriers and was favorable to the protestants below, plaintiffs here. The evidence introduced by the truck companies also established that for distances over 75 miles the truck costs are higher than the present rail and truck rates and hence the finding of the Commission "that for the longer hauls the reverse is true."

The railroads introduced evidence warranting the conclusion that a lower rail rate was necessary in order to compensate the shippers for inadequate allowances made by the railroads for tank car rentals and the shippers' costs for private unloading tracks and other necessary facilities for rail transportation.

1.

Allison, Nebraska

| Product | 1940 | | 1945 | | 1949 | |
|---|---|---|---|---|---|---|
| | Rail | Truck | Rail | Truck | Rail | Truck |
| Gasoline ... | 759,309.... | 173,790.... | 1,665,772.... | 505,611.... | 47,650.... | 2,595,579 |
| Other fuel .. | | | 3,036,402.... | 369,624.... | 21,735.... | 1,832,041 |

North Platte, Nebraska

| Product | 1940 | | 1945 | | 1949 | |
|---|---|---|---|---|---|---|
| | Rail | Truck | Rail | Truck | Rail | Truck |
| Gasoline ... | 1,683,802.... | 547,945.... | 701,209.... | 1,132,097.... | 475,328.... | 930,156 |
| Other fuel .. | | | 161,058.... | 272,992.... | 139,532.... | 209,612 |

Scottsbluff, Nebraska

| Gasoline ... | 1,752,739.... | 1,560,443.... | 950,721.... | 1,312,688.... | 8,066.... | 4,942,368 |
| Other fuel .. | | | 357,166.... | 884,027.... | 19,683.... | 2,123,057 |

■ It is true that the railroads did not submit a detailed cost study purporting to show the precise cost of handling petroleum traffic in the area. However, by stipulation of the parties the Commission had before it the annual, quarterly and monthly operating reports, the commodity reports and the operating expense and revenue reports of the defendant railroads on file with the Commission. It also had before it an exhibit showing revenue and expense statistics for each of the railroads, showing the cost of handling all traffic, including car mile and ton mile costs and the costs of handling all traffic on an "added traffic" basis, which is generally accepted to be about 50 per cent of the cost of handling all traffic. Such exhibit shows that the costs of the defendant railroads range from 23 to 32 cents per car mile and from 7.8 to 11.2 mills per ton mile, and that earnings under the proposed rail rates would average approximately 58 cents per car mile and 22 mills per ton mile. Thus, it will be seen, the average earnings on the traffic would be approximately double the cost of handling all traffic and that a detailed cost analysis was not necessary to sustain a conclusion that the proposed rates for distances greater than 75 miles would exceed costs and therefore be compensatory. Moreover, the railroad companies' witness, Nelson, General Fuel Traffic Manager of the Chicago, Burlington & Quincy Railroad, testified that as a result of his study it was his opinion that the rates would be compensatory. (Tr. 22, 23, 24.) That evidence, together with the evidence of the trucking companies that their costs for distances beyond 75 miles exceed their rates and the like railroad rates is sufficient evidence to support the Commission's findings. See Illinois Commerce Commission v. United States, 292 U.S. 474, 54 S.Ct. 783, 78 L.Ed. 1371.

■ Further, it was not necessary for the Commission to make a relative cost of service finding in order to prescribe a differential between rail rates and truck rates. See Alabama Great South-ern R. R. Co. v. United States, 340 U.S. 216, 223–225, 71 S.Ct. 264, 95 L.Ed. 225.

We also believe the report of the Commission shows that it gave adequate consideration to the national transportation policy.

■ The plaintiffs next contend that the Commission's report and order are not supported by adequate findings. In answer to this contention it seems sufficient to say that the Commission by its positive findings impliedly made the negative findings which the truck companies insist should have been made. Further, the Supreme Court has held that the Interstate Commerce Act does not compel the Commission to make detailed findings of fact except in a case where damages are awarded, but only requires the Commission to file a written report stating its conclusions, together with its decision and order, and where the Commission sufficiently discloses the essential basis of its judgment in its report the Court will not set that report aside. Alabama Great Southern Railroad Co. v. United States, supra, 340 U.S. at pages 227–228, 71 S.Ct. 264; United States v. Pierce Auto Freight Lines, Inc., 327 U.S. 515, 535, 66 S.Ct. 687, 90 L.Ed. 821.

■ The plaintiffs further complain that the report improperly referred to and relied upon similar findings in similar proceedings which determined questions of competitive petroleum rates as between motor and rail carriers, but which were not involved in the instant proceeding. The Commission did refer to other like cases in its report, but in so doing it did not decide the instant case on facts established in the other cases. Its findings demonstrate that the factual basis for its order was the record before the Commission in the present case. The Commission is an expert body within its field. Part of that experience comes from its experience in previous cases. Certainly, in our opinion, the Commission has the right to refer to experience in other cases as a guide for the application of its expert knowledge in a particular case. See United States

v. Pierce Auto Freight Lines, supra, 327 U.S. at page 529, 66 S.Ct. 687.

It is our conclusion that the findings of the Commission are based on the record in the instant case and are supported by substantial evidence; that the decision is not contrary to law and is in no respect arbitrary or capricious, and that the relief sought by the truck companies must be denied. Judgment will be entered accordingly.