IN RE APPLICATION OF ALL NEBRASKA RAILROADS.
CHICAGO, BURLINGTON & QUINCY RAILROAD COMPANY ET AL., APPELLEES, V. HERMAN BROS., INC., ET AL., APPELLANTS.
82 N. W. 2d 395

Filed April 12, 1957. No. 34040.

*Robert E. Powell,* for appellants.

*J. A. C. Kennedy, R. D. Neely, Guy C. Chambers, G. C. Holdrege,* and *J. W. Weingarten,* for appellees.

Heard before SIMMONS, C. J., CARTER, MESSMORE, YEAGER, CHAPPELL, WENKE, and BOSLAUGH, JJ.

MESSMORE, J.

This is an appeal from an order of the Nebraska State Railway Commission, hereinafter called the commission, in which the commission approved and allowed to become effective certain proposed rail rates governing the transportation of petroleum and petroleum products from points of origin in the State of Nebraska to points of destination in this state, when such traffic moves in intrastate commerce. The appeal was perfected by Herman Bros., Inc., and other highway motor carriers who filed a protest and request for formal hearing in opposition to an application filed with the commission by the Chicago, Burlington & Quincy Railroad Company and other railroad companies carrying such products as freight.

On November 21, 1955, the appellees made application in writing to the commission requesting permission to

establish, effective December 1, 1955, intrastate in Nebraska, rates on petroleum and its products published in tariff 448. The proposed rates were based generally 1½ cents per 100 pounds less than truck rates for distances of 75 miles and more, and on truck rates for less than 75 miles, except when present rail rates were lower than present truck rates, such rail rates were to be maintained.

On November 23, 1955, the appellants filed a pleading titled "Protest and Request for Formal Hearing" before the commission, in which the appellants alleged that the proposed rates were unreasonably low, were noncompensatory, unlawfully prejudiced the appellants and deprived them of traffic to which they were rightfully entitled, and would not foster sound economic conditions in motor transportation. The prayer was that the application be denied.

On December 28, 1955, the matter came on for hearing before the commission upon the application of appellees and the protest of the appellants, and hearing was had to the commission.

On December 30, 1955, the commission entered its order granting the appellees, which were all Nebraska railroads, namely: Chicago and North Western Railway Company; Chicago, Burlington & Quincy Railroad Company; Chicago, Rock Island and Pacific Railroad Company; Chicago, Saint Paul, Minneapolis and Omaha Railway Company; Missouri Pacific Railroad Corporation in Nebraska; and Union Pacific Railroad Company, authority to apply the rates, rules, and charges as set forth in Western Trunk Line Tariff 448 regarding shipments of petroleum and petroleum products moving in Nebraska intrastate traffic. It was further ordered that an emergency existed, and the said order should become effective January 1, 1956.

On January 11, 1956, appellants filed a motion for rehearing. On March 12, 1956, the commission issued its order overruling the motion for rehearing. From

the order overruling the motion for rehearing, appeal was taken by the protestants to this court.

The record discloses that on or about October 20, 1955, the appellees, with other western trunk line rail carriers, filed with the Interstate Commerce Commission freight tariff 448 naming specific carload rates in cents per 100 pounds from 14 rail shipping points in Kansas, Iowa, Nebraska, Missouri, and Minnesota to all rail stations in Nebraska for the rail transportation in tank cars of petroleum oil and its products, to become effective December 1, 1955.

The rates proposed for Nebraska intrastate rail carriage are those set forth in tariff 448, and are the same rates that were made effective by that tariff on interstate traffic on December 1, 1955. The Nebraska rail shipping points from which rates were proposed were Omaha, Superior, Doniphan, Scottsbluff, and South Omaha, where, except at South Omaha, pipe-line terminals or refineries are located.

The rates shown in tariff 448 are generally 1½ cents per 100 pounds less than truck rates on gasoline for distances of 75 miles and over. For distances under 75 miles, the rates are the same as the truck rates, except in cases where the existing rail rate was already lower than the truck rate, then the existing rail rate was not changed. The proposed rates were not subject to current Ex Parte 175 increases, except the rates from Omaha and South Omaha. The rates from other points like Doniphan, Superior, and Scottsbluff were not made subject to that increase because the appellees were trying to meet truck competition and the trucks do not have any Ex Parte 175 increases on their rates. The proposed rates constitute reductions from existing rail rates.

Official motor vehicle truck tariff No. 5 was used in ascertaining the truck rates. That tariff states rates in cents per gallon, and to ascertain the rate in cents per 100 pounds, a weight of 6.6 pounds per gallon was used,

carried to 3 decimal points. The truck rate on gasoline was used as it was lower than the truck rate on heavy oils, and gasoline constitutes the bulk of the traffic. Appellees were endeavoring to meet the competition of the truck rates on the commodity that was moving in the greatest volume. The rail rates on gasoline are normally on a higher basis than rail rates on the heavier oils, while the reverse is true of truck rates, and in meeting truck competitive rates appellees reduced the rail rate on gasoline and made the reduced rate applicable to both gasoline and heavier oils. Since the average rail loading carload on the heavier oils is 33.8 tons compared with 27.2 tons on gasoline, appellees could not justify a higher rate on the heavier oil.

Since the reduced rates on interstate traffic to Nebraska points had been in effect since December 1, 1955, from Council Bluffs and Sioux City, Iowa, and the Kansas City, Missouri, districts and a terminal at Omaha involving an interstate movement and intrastate rates to Nebraska points from Doniphan, Superior, and the other Omaha terminal had not been reduced, shippers from the latter were being discriminated against and it was necessary that this discrimination be removed by reducing the intrastate rates to the basis already established for interstate movement as set out in tariff 448. The interstate rates from Omaha, Council Bluffs, and other out of Nebraska origin points were approximately 1½ cents lower than the intrastate rate from Nebraska shipping points for the same distances.

In the transportation of petroleum products by rail in Nebraska and elsewhere in competition with appellant highway carriers, appellees are at a disadvantage in that the rail customer is required to provide by ownership or lease the rail cars, whereas all equipment is furnished by the truck carrier; and the rail shipper must clean the rail cars, whereas cleaning of truck equipment is performed by the truck carrier. The rail shipper must keep records and accounts of rail car movements, but

no such accounting is required of the truck customer. Rail service is slow as compared with truck service. Shippers must load and consignee unload rail shipments without assistance from rail carrier, whereas the truck driver usually assists in loading and unloading. The rail customer must provide large storage facilities and maintain larger inventories, all of which requires a larger capital investment than the truck customer who requires smaller storage facilities and smaller inventories. Rail customers must generally provide and maintain track facilities where none is required for truck service. Rail carriers cannot make off-track deliveries as can the highway trucks.

In 1940, 780,000 tons of gasoline were consumed in Nebraska of which appellees transported 374,000 tons, or 48 percent. By 1953, the total consumption of gasoline in this state increased to 1,755,000 tons of which the appellees transported 100,000 tons, or 5.7 percent. Appellees' originated tonnage in Nebraska declined from 233,939 tons of gasoline in 1940, to 52,736 in 1953; and 56,493 tons of fuel, road, and residual oils in 1941, to 14,515 in 1953. Appellees' terminated tonnage declined from 374,401 tons of gasoline in 1940, to 99,532 tons in 1953; and from 166,986 tons of fuel, road, and residual oils in 1940, to 92,097 tons in 1953.

In 1950, the appellees, with other western trunk line carriers, filed a tariff with the Interstate Commerce Commission establishing rates on petroleum effective February 1st on interstate traffic between points in Colorado, Wyoming, South Dakota, Nebraska, and Kansas 1½ cents per 100 pounds under the truck rates for all distances. Appellees intended to extend this basis of rates between all points in the territory tributary to Nebraska, if the rates thus proposed were allowed to go into effect, in an effort to establish rail rates on a competitive basis with highway carriers.

The proposed reduced rates were protested by highway motor carriers and suspended pending hearing

thereon in a proceeding before the Interstate Commerce Commission known as I. & S. docket No. 5853. That commission, after hearing (289 I.C.C. 457), decided on June 30, 1953, that the proposed rates of 1½ cents per 100 pounds under truck rates were necessary and proper for distances of 75 miles or more, but denied the reduction for distances less than 75 miles.

The protesting motor carriers brought suit to set aside the decision of the Interstate Commerce Commission. On November 1, 1954, a three-judge federal court sustained the order of the commission. Ward Transport v. United States, 125 F. Supp. 363. The United States Supreme Court affirmed the lower court on April 4, 1955. Ward Transport v. United States, 348 U. S. 979, 75 S. Ct. 570, 99 L. Ed. 762. Following that decision, tariff 448 was prepared and filed. The rates therein proposed were delayed by the litigation described from 1950 to the fall of 1955. The rates appearing in tariff 448 and allowed to go into effect by the Interstate Commerce Commission were in accord with that commission's ruling in I. & S. docket No. 5853, and the rates published in tariff 448 reflect the same formula approved by the Interstate Commerce Commission in its decision concerning I. & S. docket No. 5853.

The average operating cost of the different appellees of transporting freight traffic per car-mile ranged from 21.72 cents on the Union Pacific Railroad to 35.16 cents on the Chicago, Saint Paul, Minneapolis and Omaha Railroad. The additional cost of handling additional cars on present trains is imperceptible. In the event additional trains are required, the added cost is estimated at less than 50 percent of the above cost figures. The proposed rates will yield revenue per car-mile exceeding the average operating cost per car-mile of each of the appellees and by a greater margin the estimated added cost of handling additional traffic, if required. Where reductions in the existing rates occur, the revenue per car-mile from the proposed rates is from approximately

60 to 80 cents and generally exceeds 50 cents. The costs per car-mile as shown by exhibit No. 11 are system figures, and if the traffic involved in this case will produce car-mile revenue in excess of such costs, such traffic will be contributing to net revenue and therefore will be compensatory.

Consumption of gasoline in Nebraska has increased materially from 1951, so that the average consumption exceeds 500 million gallons annually. The proposal of appellees to establish rates of 1½ cents per 100 pounds under the truck rates amounts to about $500,000 annually on that quantity of fuel.

No witnesses testified for the appellants.

The appellants make reference to testimony in which they claim that at numerous points of destination to which reduced rates are proposed, no bulk plant or storage facilities for petroleum products are located on rail sidings; that in numerous instances the proposed rail rates do not adhere to the formula of being 1½ cents per 100 pounds less than the truck rates for distances beyond 75 miles; that in some instances the proposed rail rates are four or more cents per 100 pounds less than the presently existing truck rates on gasoline; and that as shown by the testimony of one of appellees' witnesses with reference to the transportation of heavier fuels, such as tractor fuel, distillate, burning oils, etc., the proposed rail rates would, in a great majority of cases, be much more than 1½ cents per 100 pounds less than the existing motor carrier rates on the same commodities.

The appellants assign as error: (1) That the order of the commission dated December 30, 1955, is unlawful, null, and void, in that the same provides that said order shall become effective within less than 10 days from the date said order was mailed to all parties at interest, contrary to the laws of this state; (2) that the commission's order of December 30, 1955, which authorizes and approves the rates, rules, and charges set forth in west-

ern trunk line tariff 448, is arbitrary, unreasonable, and contrary to law for the reason that the order is based on insufficient competent evidence and is devoid of lawful findings that said rates are not preferential and unjustly discriminatory; (3) that the order of the commission is arbitrary, unreasonable, and contrary to law in that there is no finding by the commission that the rates, rules, and regulations proposed to be established are reasonable and compensatory, there being no sufficient competent evidence that the same are reasonable and compensatory; and (4) that the order of the commission is arbitrary, unreasonable, and contrary to law in that said order would destroy rather than develop and preserve a highway transportation system properly adapted to the needs of commerce in Nebraska, and destroys rather than improves the relations between, and coordination of, transportation by motor carriers and other carriers as contemplated by the laws of this state.

In considering the assignments of error necessary to a determination of this appeal, we deem the following authorities pertinent.

Section 75-403, R. R. S. 1943, provides, in substance, that upon appeal prosecuted by any railway company or common carrier from a decision involving charges of such railway company or common carrier mentioned in such decision, the courts of this state will consider that the rates fixed by the commission are just and equitable and constitute prima facie evidence of that fact.

As stated in Farmers Union Livestock Commission v. Union P. R. R. Co., 135 Neb. 689, 283 N. W. 498: "This court is committed to the rule that a rate put into effect by order of the railway commission has the force of a statute on the subject. Unless held to be unreasonable and arbitrary by the courts, it expresses the only reasonable rate governing the subject-matter contained in the order."

In Furstenberg v. Omaha & C. B. St. Ry. Co., 132 Neb.

562, 272 N. W. 756, it was held: "Courts should review or interfere with administrative and legislative action of the railway commission only so far as is necessary to keep it within its jurisdiction and protect legal and constitutional rights. * * * On an appeal to the supreme court from an order of the railway commission administrative or legislative in nature, the only questions to be determined are whether the railway commission acted within the scope of its authority and if the order complained of is reasonable and not arbitrarily made."

The appellants contend that the commission is precluded by law from making any order issued by it effective on less than 10 days notice. In this connection, the appellants make reference to the following sections of the statutes.

Section 75-405, R. R. S. 1943, provides, in substance, that if any railway company, common carrier, or person affected thereby, shall be dissatisfied with the decision of the commission affirming, revising, annulling, or modifying any rate or rates complained of in the original schedule, or any subsequent schedule, which may be the subject of investigation, or with the decision of the commission with reference to any rate, classification, rule, charge, order, act, or regulation made or adopted by them, such dissatisfied railway company, common carrier, or person affected may institute proceedings in the Supreme Court to reverse, vacate, or modify the order of which complaint is made.

The pertinent part of section 75-406, R. R. S. 1943, is in substance as follows: The procedure to obtain such reversal, modification, or vacation of any such order or regulation made and adopted shall be governed by the provisions in force with reference to appeals from the district courts to the Supreme Court; provided, no motion for a new trial shall be required to be filed, but instead a motion for rehearing shall be filed within 10 days after the mailing of a copy of such order to the per-

sons affected, and the time for appeal shall run from the date of the ruling of the commission.

The pertinent language contained in section 75-415, R. R. S. 1943, is in substance as follows: The order or orders, together with the findings of fact and the conclusions of the commission based thereon, shall be reduced to writing and spread upon the record, and a copy thereof, with the date when the order or orders shall go into force and effect, shall be furnished to the party who complained, and any other person or persons directly interested therein, and such order or orders shall go into force and effect at such time as is, within the discretion of the commission, just and reasonable; provided, always, no order or orders shall go into force and effect within 10 days after the mailing of such notice to the persons affected thereby.

The appellants argue that the order of the commission dated December 30, 1955, to become effective January 1, 1956, involving the rates in question was not mailed to any of the parties at interest until January 7, 1956, or 1 week after such order was purportedly in full force and effect, therefore, until receipt of the official order of the commission these appellants, or any other interested party to the proceedings, had no official notice of the action taken by the commission in connection with this matter.

The appellants contend that the effective date of said order should be stayed until such time as the commission has finally passed upon the motion for rehearing which was timely filed in accordance with the provisions of section 75-405, R. R. S. 1943, and was not decided by the commission until March 12, 1956; that in view of section 75-415, R. R. S. 1943, above, the order entered by the commission could not under any circumstances have become effective prior to January 17, 1956, which was 10 days after said order was mailed to the parties at interest in this proceeding; and that consequently the order of the commission dated December 30, 1955, is in

direct violation of section 75-415, R. R. S. 1943, and is null and void.

We make reference to section 75-410, R. R. S. 1943, which in substance provides that to prevent interstate rate wars and injury to the business of the citizens of the state, railway companies or common carriers, or in case of any other emergency to be judged by the commission, it shall be the duty of the commission, notwithstanding section 75-409, R. R. S. 1943 (which section relates to rate order, injunction, and conditions precedent), to temporarily alter, amend, or suspend any existing freight rates, tariffs, schedules, orders, and circulars of any railway company or common carrier, or part thereof, in this state, and to fix freight rates where none exist, which emergency rate or rates shall apply to any one or more or all railway companies or common carriers in this state, and shall take effect at such time, and remain in force such length of time, as may be prescribed by the commission. Such emergency rates, tariffs, schedules, orders, and circulars shall be subject to review upon a hearing before the commission and courts of competent jurisdiction in this state, as herein provided for other schedules of rates fixed by the commission.

Pursuant to section 75-410, R. R. S. 1943, and the authority granted therein, the commission found, as stated in its order of December 30, 1955, that an emergency existed necessitating that the rates set forth in tariff 448 become effective on intrastate commerce on January 1, 1956.

Section 75-410, R. R. S. 1943, is a section of the statutes which specifically authorizes the commission to put into effect rates such as set forth in tariff 448 when an emergency exists. The commission was exercising its legislative authority to regulate rates as authorized, to declare an emergency, and to prescribe the time when such rates should become effective. That such emergency existed is shown when it appears that identical rates were in effect on interstate traffic in Nebraska, and

it was necessary to establish the same rates on intrastate traffic to prevent discrimination against intrastate shippers. The order of the commission could have been superseded under section 75-408, R. R. S. 1943. The record discloses no attempt on the part of the appellants to do so. We find the appellants' assignment of error to be without merit.

The appellants contend that the commission, in approving rates of railway companies and other common carriers, is charged with the duty of seeing that such rates so approved are reasonable, not preferential, or unjustly discriminatory.

The appellants cite section 75-208, R. R. S. 1943, which provides in substance that the commission shall have the power, and it shall be its duty, to make all necessary classifications, and to fix all necessary rates, charges, and regulations to govern and regulate the freight and passenger tariffs of railway companies and common carriers, the power to correct abuses and prevent unjust discrimination, extortions, and overcharges in rates of freight and passenger tariffs on the different railroads in this state, and enforce the same by having the penalties inflicted as provided in sections 75-310 and 75-311, R. R. S. 1943.

The appellants argue that the witness for the appellees testified to the effect that in establishing the proposed rates the railway lines based the same on the rates being charged by motor carriers for transportation of gasoline, which rates, in numerous instances, are lower than the rates charged by motor carriers for transportation of heavier commodities such as distillate, fuel oil, and other similar products; that in numerous instances the rates herein proposed are not subject to a recent 15 percent general increase which applies to most other traffic being handled in this state by rail carriers for interstate application, therefore, such rates would be preferential to shippers of petroleum products in this state, and discriminatory against shipments of other com-

modities which contain the 15 percent increase in rates; that the railroads, in many instances, have named rates to points of destination where there are no bulk plants located on rail sidings, and as a result no traffic actually will move from said points using said rates; that in the above instances receivers of petroleum products at points where no rail storage or unloading facilities are provided are discriminated against for the reason that the receivers of petroleum products who do not have bulk plants or storage facilities located by rail right-of-ways would not be able to take advantage of the proposed rail rates, and as a consequence they would be forced to pay transportation charges by motor vehicle on the movement of gasoline in Nebraska intrastate commerce, which would be 1½ cents per 100 pounds higher than receivers of petroleum products who could obtain the same by way of rail movement; and that on a shipment of heavier fuels such as distillates, and other similar commodities, receivers by railroad would have a greater advantage over the receivers of these same commodities by way of motor vehicles because of the fact that in most instances the rates proposed by the railroads in this proceeding on the movement of so-called heavier fuels amounted to more than 1½ cents per 100 pounds below the presently existing motor carrier rates on similar commodities.

Section 75-209, R. R. S. 1943, is referred to. This section provides in substance that it shall be the duty of the commission to fairly and justly classify all freight and property of whatsoever character, and to fix to each class or subdivision of freight a reasonable rate, for each railway company or common carrier. It further provides that said classifications shall be the same for all railway companies or common carriers.

Appellants contend this section of the statutes was not followed; that nowhere in the commission's order of December 30, 1955, is there any finding to the effect that the rates proposed are reasonable, compensatory

rates, and that the evidence does not sustain such a finding; that while a witness for the railroads stated that in his opinion the rates are compensatory, the railroads did not attempt to introduce any cost figures which would show the cost of handling this type of traffic, thus, the record being deficient in this respect, it does not enable the commission or any interested person to determine with any degree of accuracy whether or not the rates proposed are reasonable rates, and further, whether or not said rates are compensatory; that the rates set forth in tariff 448 are proposed merely for competitive reasons and bear no relationship to the cost of handling the traffic; and that the mere fact that the involved rates are based entirely on the rates established and prescribed by the commission for transportation by motor vehicle, which is an entirely different mode of transportation, is conclusive on this point.

Appellants further contend that by the establishment of the proposed rail rates on the basis of a differential of 1½ cents per 100 pounds below the lowest rates of motor carriers for the transportation of gasoline, the commission has destroyed rather than attempted to preserve the inherent advantages of motor carrier transportation contrary to the public interest, and has worsened relations between motor carriers and rail carriers; and that the order of the commission will tend to adversely affect the traffic and revenue of the motor carriers of petroleum products in this state and destroy, rather than preserve, a highway transportation system properly adapted to the needs of commerce of this state, contrary to legislative policy. Therefore, the order, which is the subject matter of this appeal, is arbitrary and unreasonable, and is null and void.

It is apparent from the evidence that the appellees have not been on a competitive basis with the motor carriers as shown in the decline of the tonnage of gasoline carried by the appellees as against that carried by

appellants or those engaged in the same business. In this connection, the following applies.

Section 75-402, R. R. S. 1943, provides in part: "The lowest rates published or charged by any railway company for substantially the same kind of service, whether in this or another state, shall, when introduced in evidence, be accepted as prima facie evidence of a reasonable rate for the services under investigation."

The interstate rates shown in tariff 448 are published and charged for the identical service in interstate transportation that the appellees proposed and the commission authorized for intrastate service in this state.

Where the state railway commission specifically adopts the rates and charges fixed by the Interstate Commerce Commission as its own, they become the regularly fixed rates and charges of the state railway commission until altered or set aside. See Farmers Union Livestock Commission v. Union P. R. R. Co., *supra*.

In addition, with reference to the proposed rates, the appellees and other western truck line carriers in 1950 filed a tariff with the Interstate Commerce Commission establishing rates 1½ cents per 100 pounds under truck rates applicable to petroleum and its products for all distances between points in Colorado, Wyoming, South Dakota, Nebraska, and Kansas. The motor carriers protested this application which resulted in investigation and suspension docket No. 5853 before the Interstate Commerce Commission in which that commission approved the proposed rates for distances of 75 miles or more, but not for lesser distances, on June 30, 1953. See 289 I. C. C. 457. In its decision the Interstate Commerce Commission said: "The record is convincing that in the territory here considered the railroads cannot successfully compete with the motor carriers at equal rates, and that the proposed rates are not lower than necessary to meet the truck competition and are compensatory, except for the shorter hauls." The protesting motor carriers then brought suit in the United States district court

for Colorado to set aside the commission's decision, before a three-judge court which upheld the decision of the commission. See Ward Transport v. United States, 125 F. Supp. 363, which was decided November 1, 1954. On April 4, 1955, the United States Supreme Court affirmed the decision of the lower federal court. Ward Transport v. United States, 348 U. S. 979, 75 S. Ct. 570, 99 L. Ed. 762.

Other cases relating to other areas are not important or material in the instant case unless the Interstate Commerce Commission reverses its decision in I. &. S. docket No. 5853 and prescribes some other formula of rates to be followed.

As indicated by the authorities heretofore set out, the commission was not required to make any specific finding as to whether the rates were reasonable or preferential.

In the light of the evidence and the foregoing authorities, the contention of the appellants that the proposed rates were not just, reasonable, and compensatory is without merit.

The appellants contend that the proposed rates are discriminatory.

In 13 C. J. S., Carriers, section 377, on page 843, relating to circumstances justifying discrimination in rates, the rule is stated as follows: "Although a common carrier is bound to carry at equal rates for all customers in like condition, * * * mere discrimination does not render a rate illegal; only such rates as are unreasonably or unjustly discriminatory are inhibited. In other words, mere inequality of charge does not necessarily constitute undue or unreasonable preference or advantage, and cannot be held illegal unless it is shown that it is not justified by the cost of the respective services, by their values, or other transportation conditions. Further, any fact which produces an inequality of condition and a change of circumstances justifies an inequality of charge, since common carriers are only bound to give the same terms to all persons alike, under the same conditions

and circumstances.  Accordingly, no claim of illegality can be sustained if, in view of all the circumstances, the discrimination is fair and reasonable, and not inconsistent with the public interest, and, subject to the two leading prohibitions that their charges shall not be unjust or unreasonable, and that they shall not unjustly discriminate so as to give undue preference or disadvantage to persons or traffic similarly circumstanced, * * *."

Any rate that is competitive discriminates to some extent against a competitor, but that does not make the rate unlawful for the reason that only unjust discrimination or undue preference under substantially similar circumstances and conditions is that which is unlawful and prohibited.

The proposed rates in many instances are not subject to Ex Parte 175 increases of 15 percent because the rates were intended to meet the appellants' competition, whose rates have not been increased.  The fact that such increases had been made effective on other commodities by appellees does not establish unjust discrimination. Neither does the fact that the proposed rate on heavier oils will be more than 1½ cents per 100 pounds below the truck rates on the same commodity.  The claim of the appellants that the proposed rates prefer shippers and receivers who have rail shipping facilities and thus discriminates against those who have no such facilities is without merit.  To any person who is in a position to use the service offered, such service is available to him.

The complaint of the appellants that the commission made no finding whether the rates were reasonable and not discriminatory is without merit.  The law of this state does not require the commission to make such a finding.  Should any unlawful discrimination exist or develop now or in the future, it is subject to correction on complaint made to the commission, supported by evidence.  Until then undue preference or unlawful discrimination are not to be presumed.  The appellants'

assignment of error of undue preference and unlawful discrimination cannot be sustained.

We fail to find by the evidence anything that would destroy the inherent advantages of motor transportation, or that would tend to destroy the highway system of this state by making effective the rates shown in tariff 448. There is no apparent violation of section 75-222, R. R. S. 1943, which section relates to the legislative policy of the state regulating motor carriers and referring generally to transportation within the state.

The appellants assign as error a denial of their motion for continuance to a later time in order to enable them to present evidence in opposition to the appellees' application. This motion was overruled by the commission. The appellants present no argument in their behalf, or discussion in support of this assignment of error. It need not be discussed.

The record disclosing competent and relevant evidence in support of the findings of the railway commission upon the questions of fact presented, and, no violation of any rule of law or constitutional right appearing, nor that the action of the commission was arbitrary or unreasonable, this court will not substitute its judgment for that of the railway commission, and its order should be, and is, affirmed.

AFFIRMED.