IN RE APPLICATION OF NEBRASKA RAILROADS, OF OMAHA, NEBRASKA.

NEBRASKA RAILROADS OF OMAHA, NEBRASKA, APPELLEES, v. NEBCO, INC., A CORPORATION, FORMERLY ABEL INVESTMENT COMPANY, APPELLANT, IMPLEADED WITH READY MIXED CONCRETE COMPANY, APPELLEE.

231 N. W. 2d 505

Filed July 17, 1975. No. 39841.

James W. Hewitt, for appellant.

Knudsen, Berkheimer, Endacott & Beam, for appellees Nebraska Railroads.

R. A. Skochdopole for appellee Ready Mixed Concrete Co.

Heard before WHITE, C. J., SPENCER, BOSLAUGH, McCOWN, NEWTON, CLINTON, and BRODKEY, JJ.

BRODKEY, J.

This is an appeal from an order of the Nebraska Public Service Commission entered in a rate proceeding instituted by Chicago and Northwestern Railway Company; Burlington Northern, Inc.; Chicago, Rock Island & Pacific Railroad Company; Missouri-Pacific Railroad Company; and Union Pacific Railroad Company, hereinafter referred to as "Nebraska Railroads," to determine whether a general commodity rail rate increase authorized by the Interstate Commerce Commission on interstate traffic should be made applicable to intrastate traffic in Nebraska. A hearing was held on June 5, 1974; and on September 23, 1974, the Nebraska Public Service Commission entered its order providing that the aforesaid Nebraska Railroads "and all other railroads doing business in Nebraska intrastate commerce, be, and are hereby authorized to increase freight rates and charges on Nebraska intrastate traffic as published in

Ex Parte X-303-A, effective October 21, 1974," and further providing "Any possible future increases in X-303 will be subject to further investigation and order of this Commission." A motion for rehearing was thereafter filed by Nebco, Inc., formerly Abel Investment Company, Lincoln, Nebraska, doing business as Ready Mixed Concrete Company of Omaha, Nebraska, which had previously filed protests to the application of the Nebraska Railroads. That motion was overruled by the Commission on October 21, 1974. Protestant, Nebco, Inc., has appealed to this court. We affirm.

By way of historical background as reflected in the record in this case, it appears that prior to December 5, 1973, Nebraska carriers, as well as carriers throughout the country, had requested a 5 percent increase in rates from the Interstate Commerce Commission in a proceeding designated as "Ex Parte 295." The ICC considered the request, but granted an interim increase of only 3 percent, in lieu of the 5 percent increase originally sought. Thereafter, on December 5, 1973, substantially all the Class I railroads petitioned the ICC for authority to increase rates and charges generally in the amount of 5 percent, subject to customary exceptions. On January 3, 1974, the ICC entered its order authorizing the filing of an increased tariff on 45 days notice to the ICC and the public. Following the order of the ICC, the carriers published Tariff X-303, scheduled to be effective February 22, 1974. However, on February 21, 1974, the ICC suspended the effective date of Tariff X-303 until September 21, 1974, and at the same time authorized a 4 percent interim increase in freight rates and charges, except on recyclables, to become effective on not less than 15 days notice to the ICC and the public. Thereupon the rail carriers published Tariff X-303-A, which became effective on March 9, 1974, on interstate traffic.

In their application filed with the Nebraska Public Service Commission on April 8, 1974, the Nebraska Rail-

roads sought an increase in the intrastate freight rates and charges to the same extent and in the same manner that interstate rates and charges had been increased by the ICC under Tariff X-303-A, alleging as the basis of their request that the facts and conditions requiring an interstate increase applied equally to intrastate rates in Nebraska. It further appears from the record that subsequent to the publication of Ex Parte Tariff 303-A, certain neighboring states have taken action to have the increase permitted in Ex Parte Tariff 303-A made applicable in such states for intrastate traffic. In particular, it appears that Iowa, Missouri, and South Dakota have adopted the tariff, and it is now in effect in those states. Colorado and Wyoming have had hearings on similar applications, and decisions on those matters are pending. Also the railroads have filed a section 13(4) proceeding with the ICC under Title 49, United States Code, section 13(4), to compel Kansas to adopt such rates. In its final report and order in Ex Parte 295, the ICC had admonished the carriers to "promptly seek increases in their intrastate rates."

In this case, the Nebraska Railroads seek an increase in their intrastate rates based on increased costs incurred since those involved in Ex Parte 295. These specifically include a 4 percent wage increase effective January 1, 1974, increased costs of fuel and other materials due to price increases since January 1, 1973, increased equipment rents, and other substantial increases with regard to depreciation, property taxes, personal injuries, fixed charges and other deductions.

At the hearing before the hearing examiner for the Public Service Commission on June 5, 1974, the Nebraska Railroads adduced evidence in support of their application for an increase in rates. Three witnesses testified for the Nebraska Railroads, and extensive documentary evidence, charts, and compilations of figures were received in evidence. Also included was a copy of Tariff X-303-A approved by the ICC, and showing its

action with regard to an increase in rates for interstate freight. Protestants adduced evidence from one witness only, he representing Ready Mixed Concrete Company. His testimony dealt only with the effect of increased freight charges on the contracts between Ready Mixed Concrete Company and its customers for the supplying of concrete for various construction projects. His testimony did not, in any way, challenge the validity or necessity of an increase in freight rates for the Nebraska Railroads as to intrastate traffic.

The first witness on behalf of the Nebraska Railroads was James F. Harrity of the cost and economics division of the Western Railroad Association, of which the Nebraska Railroads were members. He described the general nature of his duties with that association as making traffic studies, statistical analysis, cost computations, computing economic data relating to the transportation industry for the use of its member lines and compiling those data in exhibit form so that it may be introduced by a representative of their association at various hearings. His testimony and exhibits are quite lengthy and we shall not attempt to set forth in detail their contents in this opinion. Generally speaking, he annualized the costs and increases which were the basis of the claim of the Nebraska Railroads for an increase in rates. His exhibits reveal that the 4 percent wage increase, previously referred to, is costing the Nebraska Railroads $58,660,494 per year. The fuel increases amount to $31,965,831 per year, and the other material supplies increases amount to $47,450,800 per year, or a total increase of $138,077,125, which the railroads are now absorbing. He also introduced evidence showing that as a result of the granting of a 3 percent increase instead of the 5 percent increase requested in Ex Parte 295, the railroads were only recouping 41.1 percent of their expenses. He also introduced other testimony relating to the worsening financial situation of the Nebraska Railroads, and illustrating the inflationary pres-

sures with which the carriers were faced in 1973. The sum of his testimony was that the financial condition of Nebraska Railroads was shown to be steadily deteriorating, and that inflationary pressures had greatly increased costs, which the railroads had to absorb.

The next witness for the Nebraska Railroads was Frank T. Olsen, of the Burlington Northern, Inc. He testified that he was manager of commerce for that railroad; and that his duties included the assembly of facts and the presentation of testimony relating to rates before various state commissions and the ICC. In general, Mr. Olsen testified that although interstate and intrastate shipments are handled in the same trains and from the same stations, more intrastate traffic as a proportion of train tonnage moves in costlier local service, whereas interstate tonnage moves predominantly in more efficient and less costly "through" trains. He also offered testimony from which it may be concluded that conditions incident to local rail service in Nebraska are no more favorable than those incident to interstate service, and may even be less favorable. He was able to give some figures as to Burlington Northern's operations and revenue in the State of Nebraska in 1973, and testified that Burlington Northern's intrastate revenue amounted to $8,060,000. In one respect, his testimony varied somewhat from that of witness Harrity who testified that it was not possible to separate out intrastate costs for the operation of the railroad from the total systemwide costs. Olsen testified that he *believed* that figures were available at Burlington Northern's headquarters from which Nebraska intrastate costs could be computed, but that he did not have them in his office. He gave no costs or revenue figures for any railroad other than the Burlington Northern.

The third and final witness for the Nebraska Railroads was A. L. O'Neill, who was the assistant division superintendent of the Nebraska division of the Union Pacific Railroad. He testified that the same facilities were used

in Nebraska for both interstate commerce and intrastate commerce. He also testified that branch lines are more expensive than mainline traffic. The significant data adduced by the witnesses for the Nebraska Railroads in the hearing are contained and summarized in the opinion and order of the Commission issued on September 23, 1974.

Protestants contend that the Public Service Commission erred in granting a rate increase because there was not sufficient substantial evidence on record to justify such an increase and that the action of the Commission was arbitrary and unreasonable. It is undoubtedly true, as claimed by protestants, that most of the figures testified to by witnesses for the Nebraska Railroads were systemwide figures, and that others were rough estimates. This is not, however, completely true. There was evidence adduced by witness Olsen, of Burlington Northern, Inc., with regard to the intrastate revenue of that railroad in Nebraska. There was, however, no evidence of costs or expenses of operating any of the Nebraska Railroads specifically attributable to Nebraska intrastate operations. Witness Harrity specifically denied that it was possible to separate out Nebraska costs from the systemwide operations and said he knew of no way to do so with any degree of accuracy, or he would have done so. He also testified that each railroad used its own formula for allocating costs for this purpose. Witness Olsen, on the contrary, testified he thought it would be possible to separate out such costs and "thought" that Burlington Northern had records which would accomplish that purpose. We believe the foregoing fairly summarizes the testimony for the Nebraska Railroads in this case, and we now turn to an examination of the applicable law and the respective contentions of the parties.

We first consider the scope of review by this court of orders of the Public Service Commission. As pointed out in Safeway Cabs, Inc. v. Honer, 154 Neb. 533, 48 N. W.

2d 672 (1951): "This court is not a superior railway commission with authority to substitute its judgment for that of the commission." The same thought, in slightly different form, was expressed by the Supreme Court of North Carolina in State ex rel. The Utilities Commission v. Champion Papers, Inc., 259 N. C. 449, 130 S. E. 2d 890 (1963), where in discussing the sufficiency of evidence before the commission to support the findings of the commission the court stated: " 'It is the prerogative of that agency to decide that question. It is an agency composed of men of special knowledge, observation, and experience in their field, and it has at hand a staff trained for this type of work. And the law imposes on it, not us, the duty to fix rates.' " In United Mineral Products Co. v. Nebraska Railroads, 175 Neb. 285, 121 N. W. 2d 492 (1963), this court ruled that the rate-fixing power of the Nebraska State Railway Commission (now the Public Service Commission), if properly exercised, is legislative in character and has the force and effect of a statute on the subject. This court has also held that on an appeal to the Supreme Court from an order of the Public Service Commission, administrative or legislative in character, the only questions to be determined are whether the Commission acted within the scope of its authority and whether the order complained of is reasonable and not arbitrarily made. Preisendorf Transp., Inc. v. Herman Bros., Inc., 169 Neb. 693, 100 N. W. 2d 865 (1960). With specific reference to the fixing of rates for carriers by the Public Service Commission, the rule is well established that on appeal from an order of the Commission fixing rates for common carriers, the only questions for determination are whether or not the Commission acted within the scope of its authority and whether or not the order entered is reasonable and not arbitrarily made. Howard McClean Co. v. Chicago, B. & Q. R.R. Co., 187 Neb. 30, 187 N. W. 2d 300 (1971); Nebraska Limestone Producers Assn. v. All Nebraska Railroads, 168 Neb. 786, 97 N. W. 2d 331 (1959); United

Mineral Products Co. v. Nebraska Railroads, *supra*. As bearing upon the question of when the findings of the Commission may be held to be "arbitrary and capricious," it was held in Robinson v. National Trailer Convoy, Inc., 188 Neb. 474, 197 N. W. 2d 633 (1972), that if there is evidence to sustain the findings of the Commission, this court may not intervene. It is only where the findings of the Commission are against all the evidence that this court may hold the Commission's findings are arbitrary and capricious. The test, we believe, is best summarized in In re Lincoln Traction Co., 103 Neb. 229, 171 N. W. 192 (1919), wherein this court stated the rule to be: "This court upon appeal cannot disturb findings of the commission, unless it appears that some requirements of the law have been violated or disregarded, *or that the result reached cannot reasonably be derived from the facts proved.*" (Emphasis supplied.)

In this case, protestants do not question the *authority* of the Commission to increase the rates involved herein. Their basic complaint is that the action of the Commission was arbitrary and unreasonable, in that there was not sufficient evidence to support the increase in rates as ordered by the Commission. Specifically, they complain that all the evidence and statistics adduced by the Nebraska Railroads in support of their application were systemwide in nature and that there was not "separation data," taken from the systemwide figures, applicable to Nebraska operations only, and tending to show a need for an increase in intrastate rates. While we believe this case can be disposed of without the necessity of such "separation data," as will be hereinafter discussed, we wish to comment briefly upon the necessity of such data in situations such as the present case. We are in full agreement that such data should be supplied, for example, in cases where a carrier applies for modification of rates for its own company. This would obviously require the production of evidence with regard to the particular operations of that com-

pany. Here, however, we have a different type of situation, to wit, a request for an overall general increase in rates for Nebraska carriers, due to inflation and other generalized conditions affecting railroads generally. In such a situation, it would appear that such "separation data" would not necessarily be helpful or meaningful. It is true that the Supreme Court of the United States in the Minnesota Rate Cases, 230 U. S. 352, 33 S. Ct. 729, 57 L. Ed. 1511 (1913), stated the general rule to be that where a carrier does both interstate and intrastate business, to determine whether a scheme of maximum intrastate rates affords a fair return, the value of the property employed in intrastate business and the rates prescribed must be considered separately, and profits and losses on interstate business cannot be offset. However, later cases appear to have retreated from that rule under certain circumstances.

In the case of Illinois Commerce Commission v. United States, 292 U. S. 474, 54 S. Ct. 783, 78 L. Ed. 1371 (1934), the court stated: "Specific objections to the sufficiency of the findings, so far as they are not already disposed of by what has been said, are that there is no finding that the intrastate rates, before the increase, were less than maximum reasonable rates, and there was no finding which separated interstate and intrastate property, revenues and expenses of the carriers so as to make it possible to compare revenues with cost for the two classes of traffic considered separately. But these objections, and others which we need not stop to consider in detail, leave out of account the nature of the traffic and the significance of the principal and subsidiary findings showing that the conditions throughout the District were substantially the same for both classes of traffic, which were handled in the same manner. The inquiry in both proceedings was directed to the commerce of the District as a unit. The decision in the first proceeding, that the increase in interstate rates was reasonable, was made in the hope that the state commissions

would bring intrastate rates into harmony. When they failed to do so, the Commission reaffirmed its finding that the new interstate rates were reasonable and found that the intrastate rates must be raised in order that the intrastate traffic may bear its fair share of the revenue burden. It is plain from the nature of the inquiry that the rate level, to which both classes of traffic were raised, was found reasonable on the basis of the traffic as a whole. Where the conditions under which interstate and intrastate traffic move are found to be substantially the same with respect to all factors bearing on the reasonableness of the rate, and the two classes are shown to be intimately bound together, there is no occasion to deal with the reasonableness of the intrastate rates more specifically or to separate intrastate and interstate costs and revenues." As previously stated, we have concluded that there was evidence adduced in the hearing before the Nebraska Public Service Commission from which that Commission could properly conclude that there was in Nebraska a substantial identity of conditions under which interstate and intrastate traffic move which would have a bearing on the reasonableness of the rates set.

In State of North Carolina v. United States, 128 F. Supp. 718 (E.D., N.C., 1955), the court had the same problem before it and in its opinion stated: "Plaintiffs complain because the Commission made no separate valuation of the property engaged in intrastate as distinguished from interstate commerce; but we agree with the Commission that it was not practicable and that it would serve no useful purpose for this to be done. As said by the Commission in its report: 'We have found in numerous proceedings of this character that a reasonably accurate separation of values, operating revenues, and expenses as between interstate and intrastate operations appears to be impracticable. In Wyoming Intrastate Freight Rates and Charges, 287 I.C.C. 743 (February 2, 1953), we said, at page 755: "The proportionate

percentage of each individual class of traffic moving intrastate and interstate is not shown. Nevertheless, where, as is the case here, the intrastate and the interstate traffic, as a whole, moves under substantially similar conditions, and the expense of handling the two classes of traffic is inextricably woven together, any attempt to do the impracticable, namely, to show separately the costs of the intrastate and the interstate service would serve no useful purpose. See [State of] Florida v. United States, 292 U. S. 1, 9 [54 S. Ct. 603, 78 L. Ed. 1077]; Illinois Commerce Comm. v. United States, 292 U. S. 474 [54 S. Ct. 783, 78 L. Ed. 1371]; [State of] North Carolina v. United States, 325 U. S. 507 [65 S. Ct. 1260, 89 L. Ed. 1760]; King v. United States, 344 U. S. 254, [73 S. Ct. 259, 97 L. Ed. 301]." ' "

Protestants attempt to minimize the persuasiveness of the language in the above cases by pointing out that they involve proceedings under section 13(4), of the Interstate Commerce Act, which, they assert does not require the production of separation data. 49 U.S.C.A. § 13 (4). It is true that section 13, par. (4) of the Interstate Commerce Act does provide that the ICC, after investigation and hearing, may prescribe rates and fares that intrastate carriers may charge where it finds the intrastate rates unjustly discriminate against interstate or foreign commerce, "* * * which the Commission may find without a separation of interstate and intrastate property, revenues, and expenses, and without considering in totality the operations or results thereof of any carrier, or group or groups of carriers wholly within any State * * *." We point out, however, that the above-quoted language was not in the statute in question prior to 1958, and was only added to that section in that year. Both of the cases above quoted antedate 1958, and therefore reflect the thinking of the courts at that time as to the necessity of the production of "separation data," before the insertion of the specific statutory language.

However, even assuming, without deciding, that the Public Service Commission would normally require more specific Nebraska data relative to such items as revenue, costs, and expenses in discharging its statutory duty to fix necessary rates and charges of common carriers in Nebraska in intrastate commerce, as required under section 75-118, R. R. S. 1943, we nevertheless conclude that, under prior decisions of this court, there was other sufficient evidence before the Commission to justify its order in this case. It must be remembered that the Nebraska Railroads introduced into evidence at the hearing before the Commission a copy of Ex Parte 303-A, approved by the ICC, reflecting the increase in interstate rates for the same carriers. The same situation was before this court in Chicago, B. & Q. R.R. Co. v. Herman Bros., Inc., 164 Neb. 247, 82 N. W. 2d 395 (1957), a case strikingly similar on the facts to the instant case. In that case this court applied section 75-123, R. R. S. 1943 (then section 75-402), which provides, among other things: "The lowest rates published or charged by any common carrier for substantially the same kind of service, whether in this state or another state, shall, when introduced into evidence, be accepted as prima facie evidence of a reasonable rate for the services inquired into." In that case, as here, several railroads had filed an application seeking a change in intrastate freight rates. In that case, as here, protests were filed in opposition to the rate changes sought. In that case, as here, a single hearing was held by the Commission for the purpose of receiving evidence on and deciding both the application and the protest. In that case, as here, the applicants introduced into evidence a tariff which set forth the rates for interstate rail carriage as established by the ICC. In that case, as here, the Commission authorized rates for intrastate service in Nebraska which were the same as those shown in the tariff to be the rates for identical interstate service. And finally, in that case, as here, appeal was taken to this court by

the protestants, who argued among other things, that there was not sufficient evidence to establish that the rates were reasonable. In affirming the order of the Commission, this court held that where the Commission specifically adopts the rates and charges fixed by the ICC as its own, they become the regularly fixed rates and charges of the Commission until altered or set aside.

Another pertinent case is L. E. Whitlock Truck Service, Inc. v. Shippers Oil Field Traffic Assn., 171 Neb. 78, 105 N. W. 2d 588 (1960). In that case, the record included evidence showing that the intrastate rates in neighboring states and the interstate rates were, for all practicable purposes, the same as the Nebraska intrastate rates being challenged therein. It was argued that such evidence created a presumption of the reasonableness of the Nebraska rates in question. In discussing that argument this court specifically stated that "the existing rates for the same service in other jurisdictions may create a presumption of reasonableness" of those rates, although such presumption, may, of course, be overcome by other evidence.

We believe that the foregoing cases must be regarded as establishing the proposition that evidence of the existing rates for services, as established by the Interstate Commerce Commission, constitutes prima facie evidence of the reasonableness of those rates for the same services when performed in intrastate commerce in this state. This is not to say that all rates and charges for intrastate traffic as established by the Commission, must necessarily be identical to the rates and charges established for the same services by the ICC. It is altogether possible that the situation in Nebraska may be such as to justify intrastate rates different from those established by the ICC for interstate commerce. However, in cases such as this one, the burden of going forward and producing evidence tending to show that such a situation does exist in Nebraska should be, and is, on the protestants. See Preisendorf Transp., Inc. v. Her-

man Bros., Inc., *supra*, holding that rulings by the ICC in dealing with the subject of transportation by common carriers in interstate commerce may properly be considered by the Commission, and by this court on appeal therefrom, when dealing with comparable situations in intrastate commerce.

We conclude, therefore, that the Nebraska Railroads, appellees herein, by introducing evidence of the existing rates for interstate rail carriage, as established by the Interstate Commerce Commission, provided prima facie evidence of the reasonableness of those rates as adopted by the Public Service Commission for intrastate rail carriage. Furthermore, since no evidence was offered by the protestants that establish that the rates adopted by the Commission were unreasonable, we cannot say that the result reached by the Commission could not reasonably be derived from the facts proved.

Protestants strongly argue by innuendo, and without any basis in evidence or facts, that the Public Service Commission in this case abdicated its duties and responsibilities to fix intrastate rates in this case under fear or threat, veiled or otherwise, that if the Commission did not grant the increase the railroads would institute a section 13 (4) proceeding under the Interstate Commerce Act to force the adoption of the rates applied for, on the ground that the existing intrastate rates discriminate against established interstate rates. We find no evidence in the record that this is so. There is a legal presumption that the Commissioners faithfully performed their official duties as required by law, and we cannot assume otherwise, absent evidence to the contrary. Ludwig v. Board of County Commissioners, 170 Neb. 600, 103 N. W. 2d 838 (1960).

We conclude, therefore, that the Commission acted within the scope of its authority, and the order complained of was reasonable and not arbitrarily made. It must therefore be affirmed.

AFFIRMED.